Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 23, 2004        Decided July 16, 2004

No. 02-1121

MIDWEST ISO TRANSMISSION OWNERS, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PUBLIC SERVICE COMMISSION OF THE
COMMONWEALTH OF KENTUCKY, ET AL.,
INTERVENORS

———

Consolidated with
02-1122, 03-1236, 03-1256

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Paul M. Flynn* argued the cause for petitioners Midwest ISO Transmission Owners, *et al.* *John E. McCaffrey* argued

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

the cause for Public Service Commission of the Commonwealth of Kentucky, *et al*. With them on the briefs were *David W. D'Alessandro*, *Michael E. Small*, and *Robert H. Benna*. *Jeffrey G. DiSciullo* and *Linda S. Portasik* entered appearances.

*Robert H. Solomon*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor. *Larry D. Gasteiger*, Attorney, entered an appearance.

*Stephen L. Teichler* argued the cause for intervenors Midwest Independent Transmission System Operator, Inc., *et al*. With him on the brief were *Stephen G. Kozey*, *David Martin Connelly, Jeffrey L. Landsman, Christine C. Ryan, A. Hewitt Rose, III, Gary D. Bachman, Evan Charles Reese, III, William F. Fields, Sandra L. Hall, Susan Stevens Miller, David W. D'Alessandro, John E. McCaffrey, Robert Campbell McDiarmid, Larissa A. Shamraj, Denise C. Goulet*, and *David J. Lynch*. *Richard G. Raff* entered an appearance.

Before: GINSBURG, *Chief Judge*, and SENTELLE and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*:

## I.

1. In the bad old days, utilities were vertically integrated monopolies; electricity generation, transmission, and distribution for a particular geographic area were generally provided by and under the control of a single regulated utility. Sales of those services were "bundled," meaning consumers paid a single price for generation, transmission, and distribution. As the Supreme Court observed, with blithe understatement, "[c]ompetition among utilities was not prevalent." *New York v. FERC*, 535 U.S. 1, 5 (2002).

In its pathmarking Order No. 888, FERC required utilities that owned transmission facilities to guarantee all market participants non-discriminatory access to those facilities. *See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, FERC Stats. & Regs. ¶ 31,036, 31,635–36 (1996) (Order No. 888). That is, FERC required all transmission-owning utilities to provide transmission service for electricity generated by others on the same basis that they provided transmission service for the electricity they themselves generated. To effectuate this introduction of competition, FERC required public utilities to "functionally unbundle" their wholesale generation and transmission services by stating separate rates for each service in a single tariff and offering transmission service under that tariff on an open-access, non-discriminatory basis. *See New York*, 535 U.S. at 11; *see generally California Indep. Sys. Operator Corp. v. FERC*, No. 02-1287, slip op. at 2-4 (D.C. Cir. June 22, 2004).

As the next step toward the goal of a more competitive electricity marketplace, Order No. 888 encouraged — but did not require — the development of multi-utility regional transmission organizations (RTOs). The concern was that the segmentation of the transmission grid among different utilities, even if each had functionally unbundled transmission, contributed to inefficiencies that impeded free competition in the market for electric power. Combining the different segments and placing control of the grid in one entity — an RTO — was expected to overcome these inefficiencies and promote competition. Order No. 888 at 31,730–32; *see also Public Util. Dist. No. 1 of Snohomish County v. FERC*, 272 F.3d 607, 610–11 (D.C. Cir. 2001). Better still if the RTO were run by an independent system operator — an ISO. As envisioned by FERC, an ISO would assume operational control — but not ownership — of the transmission facilities owned by its member utilities, thereby "separat[ing] operation of the transmission grid and access to it from economic interests in generation." Order No. 888 at 31,654; *see also*

*id.* at 31,730–32. The ISO would then provide open access to the regional transmission system to all electricity generators at rates established in "a single, unbundled, grid-wide tariff that applies to all eligible users in a non-discriminatory manner." *Id.* at 31,731; *see also California Indep. Sys. Operator Corp.*, slip op. at 3–4. FERC called this type of separation of generation and transmission "operational unbundling," a step beyond "functional unbundling." Order No. 888 at 31,654. Although several parties to the 1996 rulemaking had requested that FERC require "operational unbundling" or even divestiture of transmission assets, it was FERC's considered judgment that "the less intrusive functional unbundling approach . . . is all that we must require at this time." *Id.* at 31,655.

By 1999, FERC had come to a less sanguine view of the curative powers of functional unbundling. In FERC's view, inefficiencies in the transmission grid and lingering opportunities for transmission owners to discriminate in their own favor remained obstacles to robust competition in the wholesale electricity market. FERC concluded that these problems could be remedied through the establishment of RTOs, explaining that "better regional coordination in areas such as maintenance of transmission and generation systems and transmission planning and operation" was necessary to address regional reliability concerns and to foster regional competition. *See Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, 30,999 (1999) (Order No. 2000) (codified at 18 C.F.R. § 35.34) (citing Staff Report to FERC on the Causes of Wholesale Electric Pricing Abnormalities in the Midwest During June 1998, at 5–8 (Sept. 22, 1998)). FERC concluded that RTOs would: "(1) improve efficiencies in transmission grid management; (2) impose grid reliability; (3) remove remaining opportunities for discriminatory transmission practices; (4) improve market performance; and (5) facilitate lighter handed regulation." Order No. 2000 at 30,993; *Public Util. Dist. No. 1*, 272 F.3d at 611. To further encourage RTO development, FERC directed transmission-owning utilities either to participate in an RTO or to explain their refusal to do so. *Public Util. Dist. No. 1*, 272

F.3d at 612. Importantly, though, Order No. 2000 still did not *require* utilities to join RTOs; participation remained voluntary. *See id.* at 616.

For those utilities opting to join an RTO, Order No. 2000 retained a flexible approach, allowing the RTOs to employ a variety of ownership and operational structures, so long as the RTO established that it had certain required characteristics and functional capabilities. *Id.* at 611. FERC required, *inter alia*, that an RTO be regional in scope, 18 C.F.R. § 35.34(j)(2); "have operational authority for all transmission facilities under its control," *id.* § 35.34(j)(3); "be the only provider of transmission service over the facilities under its control," *id.* § 35.34(k)(1)(i); and "have the sole authority to receive, evaluate, and approve or deny all requests for transmission service," *id.* Thus, whatever its structure, once a utility made the decision to surrender operational control of its transmission facilities to an RTO, any transmissions across those facilities were subject to the control of that RTO.

2. In January 1998 (more than a year before Order No. 2000), several transmission-owning utilities in the Midwest sought FERC's approval for the transfer of operational control of their transmission facilities to an ISO known as Midwest ISO (MISO), which would be organized as a non-profit, non-stock corporation. *See Midwest Indep. Transmission Sys. Operator, Inc.*, 84 FERC ¶ 61,231, 62,138–39 (1998) (*MISO Initial Approval*). MISO would link up the transmission lines of the member transmission-owning utilities (MISO Owners) into a single interconnected grid stretching across the northern border of the U.S. from Michigan to eastern Montana, and reaching as far south as Kansas City, Missouri and Louisville, Kentucky. Under the MISO proposal, the MISO Owners would retain ownership of and physically operate and maintain their transmission facilities, subject to MISO's instructions. MISO would have functional control of the transmission system, with responsibility for calculating available transmission capability; receiving, approving, and scheduling transmission service requests; and providing or arranging for ancillary services under the tariff. MISO

would also serve as the system security coordinator for the MISO Owners.

The MISO Owners concurrently applied for approval of MISO's open access transmission tariff. *See id.* at 62,166. Under the tariff, all customers would pay a single rate to use the entire MISO transmission system, based on the volume of power the customer carried on the system. The MISO Owners did not, however, propose to bring all of their own transmission loads immediately under that new open access tariff. Several of the MISO Owners were required to provide bundled retail service (generation and transmission) to consumers at rates frozen by state legislation, state regulatory agencies, or legal settlements. The MISO Owners proposed that such bundled retail loads be brought under the MISO tariff at the end of a six-year transition period, unless the state regulatory authorities unbundled those loads sooner. *See id.* at 62,167. Also, some MISO Owners had pre-existing bilateral agreements with other utilities to provide wholesale transmission service at fixed rates. The MISO Owners proposed that loads under such grandfathered agreements also remain outside of the tariff until the end of the transition period. Thus, only new wholesale and unbundled retail transmission loads would be immediately subject to the MISO tariff.

The MISO tariff included several mechanisms to recover the costs associated with running MISO. Relevant to this proceeding are Schedule 1 and Schedule 10. Under Schedule 1 of the tariff, MISO customers paid a charge for "Scheduling, System Control and Dispatch Service." MISO Open Access Transmission Tariff, Original Sheet No. 117. This charge covers MISO's primary value-added service — management of the transmission grid. This Scheduling, System Control and Dispatch Service charge, though, was to be paid by the transmission customer directly to the MISO Owner providing transmission service; at least at first, it was not to be paid to MISO. *Id.*

Schedule 10 of the MISO tariff, the ISO Cost Adder, was designed to recover MISO administrative costs — the "costs

associated with running the ISO that are not recovered under Schedule 1." MISO Open Access Transmission Tariff, Original Sheet No. 136. Those costs included "costs associated with the Security Center, including capital costs and expenses, and administering the Tariff." *Id.* The Cost Adder was to be levied on a per megawatt basis and was calculated monthly by dividing MISO's eligible budgeted costs by the expected eligible transmission load. So, for example, if MISO's expected eligible costs for June 2004 were $100,000, and MISO anticipated one million megawatts of eligible load for that same month, under Schedule 10, MISO would levy a Cost Adder of 10 cents per megawatt on the eligible transmission load. The Cost Adder, though, was capped at 15 cents per megawatt,[1] with any unrecovered costs to be financed by MISO and deferred to the end of the six-year transition period, when the debt would be repaid on a five-year amortization schedule through a surcharge to all MISO customers. *Id.* Sheet Nos. 136–37.

Critically, the MISO tariff provided that only those transmission loads subject to the tariff rates would pay the ISO Cost Adder. Transmissions under state-mandated bundled retail plans and grandfathered agreements thus were not subject to the Cost Adder; only new wholesale loads and unbundled retail loads would pay the Cost Adder.

3. The Commission conditionally approved the establishment of MISO and conditionally accepted the proposed MISO tariff for filing. But having found that "[f]or the most part, these rate terms have not been shown to be just and reasonable and may be unjust, unreasonable, or unduly discriminatory," FERC suspended the MISO tariff, and set it for a hearing. *See MISO Initial Approval*, 84 FERC at 62,167, 62,181–82. Among the issues set for a hearing was the ISO Cost Adder. *Id.* at 62,167.

---

[1] As a point of comparison, in Order No. 888, FERC found that the delivered cost of electricity to retail customers was up to $110 per megawatt in some regions of the country. *See* Order No. 888 at 31,651–52.

Following a public hearing, the ALJ determined that the proposed ISO Cost Adder was not just and reasonable because, *inter alia*, it did not apply to bundled retail loads or grandfathered loads during the six-year transition period. *See Midwest Indep. Transmission Sys. Operator, Inc.*, 89 FERC ¶ 63,008, 65,045 (1999). The ALJ concluded:

> All of the Midwest ISO Participants' transmission customers will benefit from Midwest ISO's operational and planning responsibilities for the Midwest ISO transmission system, as well as increased grid reliability of the transmission system. Therefore, to ensure that retail load will properly bear a fair [share] of the Midwest ISO's costs, all long-term firm, bundled retail, and grandfathered load should be included in the divisor in developing the Cost Adder.

*Id.*

Several utilities filed exceptions to the ALJ's decision, arguing that (1) the Cost Adder should not apply to bundled loads because such loads were not obtaining benefits commensurate with the costs imposed by the Cost Adder; and (2) applying the Cost Adder to bundled and grandfathered loads would unlawfully trap costs with transmission owners. FERC affirmed the ALJ's findings and conclusions concerning the Cost Adder, agreeing with the ALJ that "all users of the grid operated by the Midwest ISO will benefit from the Midwest ISO's operational and planning responsibilities for the Midwest ISO transmission system, as well as increased grid reliability of the transmission system." *Midwest Indep. Transmission Sys. Operator, Inc.*, 97 FERC ¶ 61,033, 61,169 (2001). The Commission concluded that it was appropriate for the bundled and grandfathered loads to pay the Cost Adder "to ensure that loads will properly bear a fair share of the Midwest ISO's costs." *Id.* The Commission denied rehearing, rejecting the MISO Owners' cost-trapping claim and explaining that any trapping of costs at the retail level "should be taken up with the appropriate state commissions." *Midwest Indep. Transmission Sys. Operator, Inc.*, 98 FERC ¶ 61,141, 61,414 (2002) (*MISO II*).

The MISO Owners then sought judicial review in this court. FERC moved for a voluntary remand, which we granted. In its order on remand, FERC adhered to its prior ruling that the bundled retail and grandfathered loads must pay the Cost Adder on the same basis as new wholesale and unbundled retail loads. *See Midwest Indep. Transmission Sys. Operator, Inc.*, 102 FERC ¶ 61,192, 61,531–32 (2003) (*MISO III*). After the Commission denied rehearing from its order on remand, *see Midwest Indep. Transmission Sys. Operator, Inc.*, 104 FERC ¶ 61,012 (2003) (*MISO IV*), the MISO Owners again sought review in this court.

## II.

"As a court of limited jurisdiction, we take seriously any suggestion that we lack the authority to act." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 296 (D.C. Cir. 2003). That does not mean, however, that all such suggestions are serious. FERC devotes 14 pages of its brief to arguing that the MISO Owners lack standing to challenge the FERC orders compelling them to pay the ISO Cost Adder, because the MISO Owners have not shown that they will not be able to recoup the Cost Adder charges at some point down the road. *See* FERC Br. 17–31.

FERC's argument is tantamount to contending that a homeowner whose house is destroyed by arson has not been injured by the arsonist, if the house was adequately insured. The challenged orders impose tangible costs on the MISO Owners, who accordingly have standing to seek judicial review.

FERC also raises a related ripeness challenge, contending that "[t]he availability of untested cost recovery mechanisms makes this case unripe for judicial review at this juncture." *Id.* at 30. Again, the fact that the MISO Owners might be able to recoup the increased charges does not make the challenge to their assessment unripe.[2]

---

[2] As explained below, *see infra* 16–17, that is not to say that the MISO Owners may now bring a challenge based on their assumed *in*ability to recoup the charges in the future.

The jurisdictional speed bumps thus cleared, we can reach the merits of FERC's orders, which we review under the familiar arbitrary and capricious standard. *See* 5 U.S.C. § 706(2)(A); *Entergy Servs., Inc. v. FERC*, 319 F.3d 536, 541 (D.C. Cir. 2003). We abide by the Commission's factual findings if they are supported by substantial evidence, *see* 16 U.S.C. § 825*l*(b), and we will affirm the Commission's orders so long as FERC "examine[d] the relevant data and articulate[d] a . . . rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Public Serv. Comm'n of New York v. FERC*, 813 F.2d 448, 451 (D.C. Cir. 1987). When FERC's orders concern ratemaking, we are "particularly deferential to the Commission's expertise." *Association of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1431 (D.C. Cir. 1996). Here we conclude that FERC's order that all MISO transmission loads must share in the ISO Cost Adder comports with reasoned decisionmaking and therefore deny the petitions for review.

1. As a threshold matter, the MISO Owners argue that FERC has switched course in these proceedings: FERC originally approved MISO with bundled retail and grandfathered loads excluded from the MISO tariff, but now has ruled that these loads must share in the ISO Cost Adder. The MISO Owners phrase this switch as a failure to comply with Section 206 of the Federal Power Act, 16 U.S.C. § 824e. That provision "permits the Commission . . . to initiate changes to *existing* utility rates and practices." *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 10 (D.C. Cir. 2002). Under Section 206, however, "FERC must first prove that the existing rates . . . are 'unjust, unreasonable, unduly discriminatory or preferential.'" *Id.* (quoting 16 U.S.C. § 824e(a)). That, the Owners contend, FERC has failed to do.

Section 206, however, is not implicated here because the Cost Adder was never unconditionally accepted. In its decision that *conditionally* established MISO and *conditionally* accepted the MISO tariff for filing, the Commission specifically set the issue of the ISO Cost Adder for a hearing pursuant to its authority under Section 205 of the Federal Power Act,

16 U.S.C. 824d(e). *See MISO Initial Approval*, 84 FERC at 62,167. In considering the ISO Cost Adder, FERC was not addressing an existing rate or practice, and so did not have to make the findings required under Section 206.

2. We can thus turn to the MISO Owners' primary contention — that FERC's order does not comport with the "cost causation principle." We have described this principle as "requir[ing] that all approved rates reflect to some degree the costs actually caused by the customer who must pay them." *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992); *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 708 (D.C. Cir. 2000); *Pacific Gas & Elec. Co. v. FERC*, No. 03-1025, slip op. at 8–9 (D.C. Cir. July 9, 2004). Not surprisingly, we evaluate compliance with this unremarkable principle by comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party. *KN Energy*, 968 F.2d at 1300–01 (citing *Alabama Elec. Coop., Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982)). Also not surprisingly, we have never required a ratemaking agency to allocate costs with exacting precision. *See Sithe/Independence Power Partners, L.P. v. FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002) ("FERC is not bound to reject any rate mechanism that tracks the cost-causation principle less than perfectly"). It is enough, given the standard of review under the APA, that the cost allocation mechanism not be "arbitrary or capricious" in light of the burdens imposed or benefits received.

We begin by recognizing that MISO is, of its Owners' own volition, a Commission-approved, Order No. 2000-compliant RTO. *See generally Midwest Indep. Transmission Sys. Operator, Inc.*, 97 FERC ¶ 61,326 (2001) (concluding MISO met the standards for RTO status under Order No. 2000). MISO thus must have operational authority over *all* of the transmission loads wheeled across the MISO Owners' transmission facilities. *See* 18 C.F.R. § 35.34(j)(3) ("The [RTO] must have operational authority for all transmission facilities under its control."); *id.* § 35.34(k)(1)(i) ("The [RTO] must be the only provider of transmission service over the facilities under its control"). This authority reaches even the bundled and

grandfathered loads that are not subject to MISO's open-access tariff transmission rates during the six-year transition period. *See MISO II*, 98 FERC at 61,411, *aff'd as modified on remand*, *MISO III*, 102 FERC at 61,532–33. This means that the MISO Owners "must take all transmission services, including transmission used to deliver power to bundled retail customers, from Midwest ISO." *MISO III*, 102 FERC at 61,532. The Owners therefore gain no traction in their argument by portraying those loads as somehow not "on" the MISO system.

The MISO Owners nevertheless maintain that bundled and grandfathered loads "will obtain only limited benefits from the MISO" and the services bought with the Cost Adder. Pet. Br. 27. To evaluate this claim, we start by reviewing the services funded by the Cost Adder. According to the MISO tariff, the ISO Cost Adder is set aside to pay for the "costs associated with the Security Center, including capital costs and expenses, and administering the Tariff." MISO Open Access Transmission Tariff, Original Sheet No. 136. The ISO Cost Adder does not pay for "Scheduling, System Control and Dispatch Service" — those costs are covered by a charge paid directly to MISO Owners pursuant to Schedule 1 of the MISO tariff. *See id.* ("The costs associated with running the ISO that are not recovered under Schedule 1 shall be recovered through [the ISO Cost Adder]."); *see also* Prepared Direct Test. of Alan C. Heintz on behalf of the Midwest ISO Participants, at 25 ("Schedule 10 will recover the actual costs associated with running the Midwest ISO that are not recovered under Schedule 1. These costs will include the costs associated with the Midwest ISO Security Center, including capital costs and expenses, and the costs of administering the Tariff."). It thus seems that the costs allocated by the Cost Adder are primarily MISO's startup expenses — particularly those pertaining to the MISO Security Center — and certain expenses pertaining to the creation and administration of MISO's open-access tariff.

In *Entergy Services*, we recently observed that "upgrades designed to 'preserve the grid's reliability' constitute 'system enhancements [that] are presumed to benefit the entire sys-

tem.'" 319 F.3d at 543 (quoting *Western Massachusetts Elec. Co. v. FERC*, 165 F.3d 922, 923, 927 (D.C. Cir. 1999)). For their part, the MISO Owners do not contest this presumption. They readily concede that all transmission customers — bundled, unbundled, grandfathered, whatever — benefit from the enhanced reliability and security MISO brings to the transmission grid. *See* Pet. Br. 36 ("There is no disagreement that bundled retail load receives *some* benefit from the MISO"); Oral Arg. Tr. of Paul M. Flynn, Counsel for Petitioners MISO Owners, at 9 (Question: "[FERC] determined that the ISO improved that reliability for those with bundled loads as well, right?" Answer: "Oh, absolutely. And we have no argument with that."); Prepared Rebuttal Test. of Alan C. Heintz on behalf of the Midwest ISO Participants, at 7 (Heintz Rebuttal Test.) ("[T]he Midwest ISO's fulfillment of its responsibilities as a Security Coordinator will also benefit other parties that are not directly receiving transmission service from the ISO.").

The MISO Owners nevertheless contend that these benefits account for only a small fraction of the Cost Adder expense. Citing the testimony of their expert, the MISO Owners claim that only five percent of the Cost Adder pays for MISO's role as regional reliability coordinator. Pet. Br. 36 (citing Heintz Rebuttal Test. 7). Pointing to the facts that 60 to 70 percent of the transmission load on the MISO system is bundled or grandfathered load and that the Cost Adder is allocated according to transmission load, the MISO Owners complain, essentially, that bundled and grandfathered loads are not getting their money's worth from the Cost Adder. The MISO Owners allege that, under FERC's decision, they end up paying 60 to 70 percent of the freight for five percent of the benefits. MISO Owners argue that FERC should have unbundled the expenses under Schedule 10, and charged bundled loads only those costs incurred for their benefit. Pet. Br. 39.

Upon review of the record in this case, we conclude that FERC reasonably allocated the Cost Adder to all loads using the MISO transmission system, rather than just the unbundled retail and new wholesale loads. The MISO Owners'

assertion that only five percent of the Cost Adder is attributable to MISO's regional reliability function misrepresents the record evidence. Their expert witness said no such thing. Rather, he testified:

> Although the expected infrastructure requirements for the Security Coordinator function are intertwined with those expected for the ISO's other functions, it is my understanding that *elimination of the Security Coordinator function might eliminate less than 5 percent of the Midwest ISO's expected capital costs*, and would eliminate little of the expected staffing requirements. This is because much of the staff and systems that are needed in any event to support the other functions will also support the Security Coordinator function.

Heintz Rebuttal Test. 7–8 (emphasis added).

The MISO Owners' conclusion that only five percent of the Cost Adder is used to fund regional reliability logically does not follow from their witness's testimony that eliminating security operations would reduce MISO's capital expenditures by less than five percent. Even accepting the MISO Owners' implicit (but false) premise that the Cost Adder funds only capital expenditures, capital expenditures — real estate, fixtures, furniture, etc. — almost always serve multiple purposes; they are, in the words of the MISO Owners' witness, "intertwined." *Id.* at 7. Therefore, when a company eliminates a particular function, that company will not necessarily be able to reduce much in the way of its capital expenditures; those capital expenditures may still be required to support the company's other functions. It is thus quite wrong to assert, as the MISO Owners do, that only five percent of the Cost Adder is devoted to security operations, simply because eliminating that function would only reduce costs by that amount. Far from demonstrating how little of the Cost Adder is needed to fund MISO's reliability and security operations, the testimony elicited by the MISO Owners establishes the "intertwined" nature of capital expenditures, and the corresponding difficulty of unbundling them. This is why, among other very good reasons, the cost causation principle

does not require exacting precision in a ratemaking agency's allocation decisions. *See Sithe/Independence Power Partners*, 285 F.3d at 5.

In addition, the bundled and grandfathered loads draw more benefits from MISO than simply enhanced transmission security and reliability. As the MISO Owners themselves recognized in their application to FERC to establish MISO, benefits such as "an overall reduction in the costs of transmitting energy within the region" and "large scale regional coordination and planning of transmission" would redound to all users of the transmission grid. *See MISO Initial Approval*, 84 FERC at 62,140.

Indeed, the costs covered by the ISO Cost Adder under Schedule 10 are the administrative costs of *having* an ISO. Transmission costs — the costs of *using* the system — are allocated to users under Schedule 1. And even if they are not in some sense *using* the ISO, the MISO Owners still benefit from *having* an ISO. In this sense, MISO is somewhat like the federal court system. It costs a considerable amount to set up and maintain a court system, and these costs — the costs of *having* a court system — are borne by the taxpayers, even though the vast majority of them will have no contact with that system (will not *use* that system) in any given year. The public nevertheless benefits from *having* a system for the prompt adjudication of criminal offenses and the orderly resolution of civil disputes. Litigants bear some of the costs of *using* this system through the payment of filing fees and court costs. They, like utilities transmitting power under the MISO open access tariff who pay according to Schedule 1, are paying for the specific benefit of *using* the court system. The MISO Owners' position is tantamount to saying that if they are not a litigant, they should not be made to pay for any of the costs of *having* a court system. Since the MISO Owners do, in fact, draw benefits from being a part of the MISO regional transmission system, FERC correctly determined that they should share the cost of *having* an ISO.

For all these reasons, we conclude that FERC's allocation of the Cost Adder to all users of the MISO grid, according to

transmission volume, meets the minimum standards for reasoned decisionmaking required by the APA.[3]

3.  The MISO Owners alternatively contend that FERC, by levying the Cost Adder on bundled retail and grandfathered loads, created an "unnecessary risk of an unlawful trapping of costs." Pet. Br. 44 (citing, *inter alia*, *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 971–72 (1986)). Specifically, the MISO Owners complain that their bundled retail rates and grandfathered contracts are essentially immutable, so that when the Cost Adder increases their cost of transmission under those contracts, those new costs are trapped with utilities, rather than passed on to consumers.

We have recognized that a "cost-trapping" claim can accrue when "a state exercises its 'jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate.'" *Louisiana Public Serv. Comm'n v. FERC*, 184 F.3d 892, 899 (D.C. Cir. 1999) (quoting *Nantahala Power & Light*, 476 U.S. at 970). The MISO Owners here make something of a reverse cost-trapping argument — FERC has trapped costs under rates that are set by states or other contractual partners and has thereby

_____

[3] We have also considered the contention of MISO Owners Louisville Gas & Electric Company and Kentucky Utilities Company (LG&E/KU) that FERC failed to meaningfully address their argument that application of the ISO Cost Adder to them "is especially arbitrary and egregious" because they bring low-cost power to MISO, Pet. Br. 59, and they regarded the transition period — including exemption of their bundled retail and grandfathered loads from the Cost Adder — as a fair trade for this benefit, *see id.* at 59–69. This is simply a variation on the MISO Owners' general argument, and FERC rejected it by "reiterat[ing] that bundled retail and grandfathered wholesale loads, including LG&E/KU's, benefit from the services provided by Midwest ISO, and, therefore . . . must be included in the calculation of the ISO Cost Adder." *MISO IV*, 104 FERC at 61,030 (footnote omitted); *see also id.* at 61,029 (FERC "cannot be bound by the unreasonable assumption that it will approve a proposed tariff provision as just and reasonable simply because an entity relied on that provision.").

diminished the MISO Owners' return. This claim fails for at least two reasons.

First, the "risk" the MISO Owners complain about is just that — a risk. It is an essential element of any cost-trapping claim that real costs actually be trapped — stuck with the regulated entity — resulting in reduced profits. The MISO Owners cannot presently point to any loss resulting from FERC's alleged cost-trapping, because it is not known what action will be taken by state regulators in response to the imposition of the ISO Cost Adder.

More fundamentally, whatever the fate of any future cost-trapping claim raised in response to prospective state regulatory action, the reverse cost-trapping argument the Owners *now* seek to raise fails as a legal theory. The decision that first approved cost-trapping claims, *Nantahala Power & Light*, was based on the Supremacy Clause and principles of federal preemption; the Court held that the state regulatory authority, by increasing the utility's cost of service after FERC had established a cost-based rate for the utility, impermissibly interfered with FERC's authority to set just and reasonable rates. *See* 476 U.S. at 970–72. We have never, though, recognized as valid a reverse cost-trapping claim of the variety brought by the MISO Owners — where it is a *federal* regulatory action that is purportedly interfering with a *state*'s regulatory scheme. Federal preemption and the Supremacy Clause do not circumscribe FERC's authority; those principles operate to prevent the states from taking regulatory action in derogation of federal regulatory objectives. If, as the MISO Owners fear, the FERC-approved application of the Cost Adder to bundled and grandfathered loads results in "trapped" costs, their initial recourse is to their state regulators and contractual partners armed with principles of federal preemption and the Supremacy Clause — not to FERC.

\* \* \*

The petition for review is denied.