# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued September 5, 2008      Decided October 31, 2008

No. 06-1408

PUBLIC SERVICE COMMISSION OF WISCONSIN,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

AMERICAN TRANSMISSION COMPANY, LLC *ET AL.*,
INTERVENORS

---

No. 07-1016

AMERICAN TRANSMISSION COMPANY, LLC *ET AL.*,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PUBLIC SERVICE COMMISSION OF WISCONSIN *ET AL.*,
INTERVENORS

---

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Channing D. Strother, Jr.* argued the cause for petitioner Public Service Commission of Wisconsin.

*Kira E. Loehr* argued the cause for petitioner American Transmission Company, LLC and the intervenors in support of the petitioners. *William Lee Cullen* and *Daniel L. Sanford* were on brief. *Curt F. Pawlisch* entered an appearance.

*Judith A. Albert*, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondent. *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor, were on brief.

*Stephen L. Teichler, Ilia Levitine*, *William Raymond Derasmo*, *Wendy N. Reed*, *Andrew T. Swers* and *Amanda M. Riggs* were on brief for intervenors Midwest ISO Transmission Owners *et al. Jeffrey M. Jakubiak* entered an appearance.

Before: SENTELLE, *Chief Judge*, and HENDERSON and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The petitioners, the Public Service Commission of Wisconsin (PSCW) and American Transmission Company LLC (ATC),[1] challenge two orders of the Federal Energy Regulatory

---

[1]PSCW is an independent state agency that regulates Wisconsin retail utility rates and exercises authority over Wisconsin utilities' construction of major projects. ATC is an independent transmission company created by the Wisconsin legislature (effective January 1, 2001) and authorized to acquire ownership of and to operate all Wisconsin high voltage transmission as well as to build additional Wisconsin transmission facilities as necessary. *See* Wis. Stat. § 196.485 (2006). ATC is a MISO member.

Commission (FERC or Commission) approving a proposed tariff revision filed by the Midwest Independent Transmission System Operator, Inc. (MISO), a regional transmission organization (RTO).[2] *Midwest Indep. Transmission Sys. Operator, Inc.,* 114 F.E.R.C. ¶ 61,106 (Feb. 3, 2006) ("Order Conditionally Accepting and Suspending Proposed Tariff Revisions and Establishing Technical Conference") (FERC Tariff Ord.); *Midwest Indep. Transmission Sys. Operator, Inc.,* 117 F.E.R.C. ¶ 61,241 (Nov. 29, 2006) ("Order on Technical Conference, Rehearing, Clarification, and Compliance") (FERC Reh'g Ord.). The proposed revision included a provision to allocate among MISO transmission customers[3] region-wide a portion of the costs of qualifying transmission upgrades built by individual MISO transmission providers but to exclude from such cost sharing any upgrade project that was already "planned" as of the date the proposed revision was filed. The petitioners contend the cost allocation policy is arbitrary and discriminatory insofar as it excludes updates planned before the filing. Applying our deferential standard of review to FERC's ratemaking orders, we conclude that FERC did not err in approving the cost allocation policy MISO proposed.

---

[2]MISO's member transmission providers are the owners of transmission facilities. MISO exercises functional control over the facilities, calculating available transmission capability and receiving, approving and scheduling transmission service. *See Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1365-66 (D.C. Cir. 2004).

[3]A "Transmission Customer" is defined as "any eligible customer (or its designated agent) that can or does execute a transmission service agreement or can or does receive transmission service." 18 C.F.R. § 37.3(b).

4

**I.**

On December 20, 2001, FERC granted MISO RTO status in order to provide open access to MISO's electricity transmission system to all member utilities in fifteen midwestern states and one Canadian province. *Midwest Indep. Transmission Sys. Operator, Inc*., 122 F.E.R.C. ¶ 61,283, ¶ 57 (2008). Accordingly, since early 2002 MISO has provided transmission service under a single open access transmission tariff.

In March 2004, MISO stakeholders[4] formed a Regional Expansion Criteria and Benefits (RECB) Task Force "charged with developing criteria for including transmission projects in the Midwest ISO Transmission Expansion Plan ('MTEP') and developing methods for allocating and recovering costs of the projects included in the MTEP." Aff. of Martin Blake 7. Formation of the RECB Task Force was "precipitated" by disagreement among stakeholders over "treatment of generator upgrades," specifically whether and to what extent the costs of such upgrades should be spread among MISO's transmission customers. Letter from Stephen G. Kozey, Vice President, General Counsel and Secretary, MISO, to Hon. Magalie R. Salas, Secretary, FERC 14 (filed Oct. 7, 2005) (Cost Allocation Policy Letter).

In an order issued July 8, 2004 addressing proposed revisions to MISO's tariff, FERC approved MISO's "general proposal to implement the 'default' pricing proposal of [FERC]

[4]MISO's stakeholders include "large transmission-dependent utilities, municipals and cooperatives, independent generators, power marketers, large retail customers, consumer advocates and state commissions." *See Midwest Indep. Transmission Sys. Operator, Inc.*, 109 F.E.R.C. ¶ 61,168, at 61,809-10 (2004).

Order No. 2003"[5] pending MISO's filing of its own proposal. *Midwest Indep. Transmission Sys. Operator, Inc.,* 108 F.E.R.C. ¶ 61,027, at 61,147 (2004). FERC's order further advised:

> We note that Midwest ISO states its intent that the default pricing proposal will remain in effect only until a pricing policy based on the . . . principle of payment for upgrades by those that cause and benefit from the upgrades can be established by Midwest ISO and its stakeholders. This is a goal supported by many intervenors in this proceeding, and we encourage Midwest ISO to continue to work with stakeholders in considering such a pricing policy. Midwest ISO outlines the actions it is taking to develop such a proposal, and while we will not impose a deadline for filing the proposal at this time, we expect Midwest ISO to work with stakeholders to meet its goal of having a permanent pricing policy in effect by December 1, 2004.

*Id.* (footnotes omitted), *order on reh'g,* 109 F.E.R.C. ¶ 61,085 (2004).

In June 2005, MISO published the "Midwest ISO Transmission Expansion Plan 2005" (MTEP 05), which, *inter alia*, contained a list of upgrade projects contemplated by each MISO transmission provider. The list identified each provider's projects as either "planned" or "proposed" based on the provider's characterization thereof. A "planned" project was defined as "the preferred solution to an identified issue" and a

---

[5]*See Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 F.E.R.C. ¶ 61,103 (2004), *order on reh'g*, Order No. 2003-A, 106 F.E.R.C. ¶ 61,220 (2004), *order on reh'g*, Order No. 2003-B, 109 F.E.R.C. ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 F.E.R.C. ¶ 61,401 (2005).

"proposed" project as "a tentative solution to an identified issue." MTEP 05 app. A.

On September 16, 2005, the RECB Task Force adopted a policy for allocating costs of new electrical generation projects, which the MISO Board of Directors approved. Cost Allocation Policy Letter 11-12; FERC Tariff Ord. at 61,349. Accordingly, on October 7, 2005, MISO filed with FERC proposed tariff revisions to implement the policy. The filing included a letter from MISO Vice President, General Counsel and Secretary Stephen G. Kozey to FERC's Secretary setting out the substance of the proposed policy and explaining the process leading to its adoption, along with two attachments.[6] Attachment FF (titled "Transmission Expansion Planning Protocol") included a cost allocation provision which proposed that twenty per cent of the costs of "Baseline Reliability Projects" (i.e., upgrade projects "needed to maintain reliability while accommodating the ongoing needs of existing Market Participants and Transmission Customers"),[7] involving voltage of 345 kV and above "be allocated on a system-wide basis to all Transmission Customers and recovered through a system-wide rate," with the remaining eighty per cent of the costs to be "allocated on a sub-regional basis to all Transmission Customers in designated pricing zones." Attachment FF ¶¶ II(A)(1), III(A)(2)(c)(ii). Attachment FF also included a "Grandfathered Projects" clause which provided:

---

[6]*See* Letter of MISO Vice President, General Counsel and Secretary Stephen G. Kozey accompanying MISO Cost Allocation Policy Filing 14 (filed Oct. 7, 2005) (Cost Allocation Policy Letter).

[7]FERC defines "market participant" generally as "[a]ny entity that, either directly or through an affiliate, sells or brokers electric energy, or provides ancillary services to the Regional Transmission Organization." 18 C.F.R. § 35.34(b)(2).

> The cost allocation provisions of this Attachment FF shall not be applicable to transmission projects identified in Attachment FF-1, which is based on the list of projects designated as Planned Projects in [MTEP 05] . . . .

Attachment FF ¶ III(A)(2)(b). Attachment FF-1, in turn, contained a "List of Planned Projects to be Excluded from Regional Cost Allocation," which, without explanation, included 36 projects that had been listed as "proposed" (rather than "planned") in MTEP 05. In an order issued February 3, 2006, FERC conditionally accepted the proposed tariff revisions, effective February 5, 2006, "subject to further modifications," including a directive that MISO "correct language in section 3.A.2.b. on Sheet No. 1841 which describes the Excluded Projects List as based on the planned projects of the MTEP 05" because "the actual list is based on the planned project list with some additions of proposed projects that the Midwest ISO has determined to be in advanced stages of planning." FERC Tariff Ord. at 61,348, 61,364.[8] The Commission concluded that MISO's proposed cost allocation policy was "a reasonable compromise position from which this independent transmission provider, with significant stakeholder input, may start to apply regional cost sharing of transmission expansion projects" and that it did not "place[] any undue disadvantage on any one party." *Id*. at 61,363-64.

On April 4, 2006, MISO issued a new version of Attachment FF, which revised the Grandfathered Projects clause to read:

---

[8]The FERC Tariff Order further directed Commission staff "to convene a technical conference to explore the issues raised by the Midwest ISO's proposal for the degree of regional cost sharing for reliability projects at 345 kV and above." FERC Tariff Ord. at 61,366.

> The cost allocation provisions of this Attachment FF shall not be applicable to transmission projects identified in Attachment FF-1, which is based on the list of projects designated as Planned Projects in [MTEP 05] <u>and some additions of proposed projects that the Transmission Provider has determined to [be] in the advanced stages of planning.</u>

Revised Attachment FF ¶¶ III(A)(2)(b) (issued April 4, 2006) (underlining of revised language in original) (alteration added).

ATC and PSCW filed requests for rehearing, which the Commission denied in an order issued November 29, 2006, iterating that MISO's cost allocation policy reflected "a reasonable compromise" and was "not unduly discriminatory." FERC Reh'g Ord. ¶¶ 94, 98.

ATC and PSCW each filed a petition for review of the Commission's two orders upholding the cost allocation policy. We consolidated the two petitions. *Pub. Serv. Comm'n of Wis. v. FERC*, No. 06-1408 (filed Mar. 16, 2007).

## II.

"We review FERC's orders by applying the Administrative Procedure Act's 'arbitrary and capricious' standard." *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 256 (D.C. Cir. 2007) (citing 5 U.S.C. § 706(2)(A); *Midwest ISO Transmission Owners v. FERC,* 373 F.3d 1361, 1368 (D.C. Cir. 2004)). As to the facts, the Commission's findings are "conclusive" if "supported by substantial evidence." 16 U.S.C. § 825*l*(b). "[W]e are 'particularly deferential to the Commission's expertise' " where, as here, the orders under review "concern ratemaking." *Midwest ISO Transmission Owners,* 373 F.3d at 1368 (quoting *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1431 (D.C. Cir. 1996)). Given the high degree of deference we accord the Commission, we conclude that the petitioners have not carried their burden of showing the Commission acted arbitrarily when it approved

MISO's proposal to spread upgrade costs on a "going forward" basis. *See Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 260 (D.C. Cir. 2007) (" 'The burden . . . is on the petitioners to show that the Commission's choices are unreasonable and its chosen line of demarcation is not within a zone of reasonableness as distinct from the question of whether the line drawn by the Commission is precisely right.' " (quoting *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1084 (D.C. Cir. 2002))).

FERC determined that MISO's going forward policy, favored by a majority of MISO stakeholders, was "just and reasonable," concluding it reflected a "reasonable compromise" which "recognize[d] the existing state of the system along with those projects which were already planned" and put all transmission providers "on equal footing in so far as they were unaware of what, if any, future cost sharing might be available and were therefore unable to manipulate the process by how they designated their projects." FERC Tariff Ord. at 61,351, 61,363-64. In making this determination, the Commission " 'examine[d] the relevant data and articulate[d] a . . . rational connection between the facts found and the choice made' " and we are therefore bound to uphold its decision. *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alteration and ellipsis in original). Further, FERC's decision is consistent with its established practice to "give deference to regional choices . . . on how to allocate the costs of transmission expansions." *New England Power Pool v. New England Power Pool*, 105 F.E.R.C. ¶ 61,300, at 62,450 (2003). Nonetheless, the petitioners challenge FERC's decision on various grounds, which we address in turn.[9]

---

[9]While each petitioner raised separate arguments in its briefs, each also expressly adopted the other's arguments. *See* PSCW Br. 6;

### A. *Misplaced Reliance on the RECB Task Force*

The petitioners contend that FERC erred in "[g]iving [w]eight to the [n]on-[c]onsensus '[s]takeholder [p]rocess,' " relying on the recommendation of the RECB Task Force, which entity "consist[ed] predominately of vertically integrated utilities located outside of Wisconsin."[10] PSCW Br. 20. They claim that vertically integrated utilities "could and did, to their economic benefit and without regard to benefits and cost causation, engage in an economic cram down of costs on Wisconsin, a small minority." *Id*. at 9. We find this argument unpersuasive. First, the Commission often gives weight to "a proposal [that] may not 'represent complete stakeholder consensus' " but is " 'the position of the majority of the transmission owning members of [the RTO].' " *Am. Elec. Power Serv. Corp. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 122 F.E.R.C. ¶ 61,083, ¶ 172 (FERC 2008) (quoting *PJM Interconnection, L.L.C.*, Opinion No. 494, 119 F.E.R.C. ¶ 61,063, ¶ 56 (2007)) (alteration by court). Further, the petitioners do not offer any evidence of majority overreaching or assert the process "was not 'open' or did not 'allow[] for extensive participation.' " PSCW Br. 21. Instead, they challenge the fairness of the cost-allocation policy the majority approved at the conclusion of the lengthy deliberative process, which, as we have noted, FERC reasonably determined to be "just and reasonable." FERC Tariff Ord. at 61,351. That the allocation starting date the majority chose may have affected Wisconsin projects disproportionately in the short

ATC Br. xiv.

[10]A "vertically integrated utility" is a "single regulated utility" which provides "electricity generation, transmission, and distribution for a particular geographic area." *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 246 (D.C. Cir. 2007).

term[11]—because of the large number of projects ATC had "planned" before that date—does not make the policy "unduly discriminatory." As FERC explained on rehearing, "ATC will benefit from the cost sharing proposal in the future," noting that "four projects by ATC, amounting to over $350 million, should qualify for regional and/or sub-regional cost sharing under the Midwest ISO cost allocation policy." FERC Reh'g Ord. ¶ 98.

The petitioners challenge in particular FERC's finding "that the exclusion list 'is a reasonable compromise position' " as "not based upon any MISO contention in the October 7 filing, which nowhere characterized the exclusion list as a 'compromise.' " PSCW Br. 22; *see* FERC Tariff Ord. at 61,363; FERC Reh'g Ord. ¶ 94. The petitioners further contend that the proposal was in fact "not a compromise midpoint between positions." PSCW Br. 23; *accord* ATC Reply Br. 8-9. In any event, PSCW contends, FERC had "a[] [Federal Power Act] duty to independently determine whether the proposal before it is just and reasonable." PSCW Br. 26 (footnotes omitted); *cf Tejas Power Corp. v. FERC*, 908 F.2d 998, 1003 (D.C. Cir. 1990) (although court "has consistently required the Commission to give weight to the contracts and settlements of the parties before it," "the Commission may approve the settlement and certificate the proposed service only if, in its independent judgment, the new service 'is or will be required by the present or future public convenience and necessity' " (quoting 15 U.S.C. § 717f(e)) (internal citation omitted). We reject this argument as well.

First, in its October 7, 2005 filing, MISO did characterize its cost allocation proposal, of which the Excluded Projects List is a part, as a "compromise," that is, "a midpoint between

---

[11]The petitioners claim that the excluded Wisconsin projects have a total investment cost of around $690 million, PSCW Br. 12; ATC Br. 10, or 55 per cent of the costs of all of the excluded projects, PSCW Reply Br. 4.

generators being directly assigned all costs as in other RTOs/ISOs and the tariffs applicable to non-independent transmission providers that required the refunding of all costs." Cost Allocation Policy Letter 14. MISO explained that the proposal was "a tenuous balance that was voted on by task force members as a package, and to change individual elements would result in a proposal for which support for the proposal as a whole would be highly uncertain." *Id*. 14-15; *see also* Mot. to Intervene and Supporting Comments of the Midwest ISO Transmission Owners 3-4 (Oct. 28, 2005) (describing negotiating positions and compromises). With regard to the Excluded Project List in particular, MISO recounted that stakeholders had been concerned "about the wide variability in [then] current investment projections, in addition to the fact that some Midwest ISO member systems [we]re currently in a building crest, while others [we]re not" and, when discussions "did not yield a method that stakeholders could agree on or uniformly support," the RECB Task Force adopted the going forward approach, which was "an equitable way to resolve this critical 'starting-point' issue." Cost Allocation Policy Letter 13. In any event, the Commission noted on rehearing that, notwithstanding some parties "disagree[d] with the use of the phrase 'compromise position,' [their] request for rehearing d[id] not change [FERC's] findings in the February 3 Order with regard to the appropriateness of the RECB Task Force process." FERC Reh'g Ord. ¶ 95. Finally, as explained above, FERC did make its own, independent assessment that the policy was "just and reasonable," FERC Tariff Ord. at 61,351, and that assessment is neither arbitrary nor capricious.

## B. The "Proposed"/"Planned" Distinction

We next address the petitioners' contention that FERC's reliance on the RECB Task Force's distinction between "planned" projects and "proposed" projects was arbitrary in several respects. We find none of their arguments persuasive.

The petitioners first argue it was arbitrary to create the Excluded Projects List "based on [an] individual transmission owner's self-identified 'Planned' and 'Proposed' transmission projects," noting in particular that some "proposed" projects have similar (or even earlier) in-service dates than some that are "planned." ATC Br. 14. As "[t]he most compelling evidence of the arbitrary nature of the Planned and Proposed designations," the petitioners cite "the fact that the Midwest ISO included on the Excluded Projects List not just all of the Planned projects in Appendix A, but 36 of the Proposed projects." *Id.* On the first point, FERC recognized that MISO reasonably decided to focus not on the in-service date but on the stage of a project's planning as of October 7, 2005, in keeping with its going forward rationale. As for the second, that MISO treated some projects as "planned" notwithstanding the owners' "proposed" designation suggests that, contrary to the petitioners' assertion, MISO did *not* blindly accept the owners' own characterization.

The petitioners also challenge FERC's determination that MISO changed the 36 projects' designations from "proposed" to "planned" because of those projects' advanced planning stage. The petitioners assert that this explanation for the changes first appears in FERC's February 3, 2006 Tariff Order, pointing out that only after that Order issued did MISO insert the rationale into its revised Attachment FF. *See* FERC Tariff Ord. at 61,361 (noting "proposed" projects that "were sufficiently advanced in the planning process . . . were viewed by the Midwest ISO as being, for practical purposes, 'planned'"); Revised Attachment FF ¶ III(A)(2)(b) (issued April 4, 2006) ("The cost allocation provisions of this Attachment FF shall not be applicable to transmission projects identified in Attachment FF-1, which is based on the list of projects designated as Planned Projects in [MTEP 05] and some additions of proposed projects that the Transmission Provider has determined to [be] in the advanced stages of planning." (underlining of revised language in original)). The record

contains evidence, however, that at an August 19, 2005 meeting (before the October 7, 2005 Cost Allocation Policy Letter designating the 36 projects as "proposed"), "the [MISO] stakeholders voted to use the list of projects that were identified as 'planned' in MTEP 2005 *or that were identified as 'proposed' but were so far along that they really should be identified as 'planned.'* " Blake Aff. 13 (emphasis added). Further, the petitioners point to no specific project they claim was misdesignated. Nor did they do so before the tariff revision was filed on October 7, 2005—notwithstanding MISO, before its revised filing, "offered any Transmission Owner that wanted the opportunity to argue that one or more of its projects that were represented as Planned Projects in the MTEP 05 should be considered more tentative in nature and thus be re-categorized as Proposed projects (subject to cost sharing as they are determined going forward in the regional planning process to be necessary or Planned projects)." Cost Allocation Policy Letter 13.[12]

The petitioners next argue that FERC failed to "articulate a reasoned explanation based on substantial evidence in the record in order to treat some regionally beneficial projects in development differently from other regionally beneficial projects in development." ATC Br. 17-18. As we have already concluded, however, FERC provided an adequate rationale. The Commission explained that MISO reasonably adopted the planned/proposed distinction to provide a "going forward" cost sharing system which reasonably limits the cost sharing to those

---

[12]The petitioners also fault FERC's failure to define the "advanced planning" criterion in its orders. This objection is barred because it was not raised before the Commission. *See* 16 U.S.C. § 825*l*(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.").

upgrades planned after the tariff revision was proposed and pursuant to its terms.

Finally, the petitioners contend the planned/proposed distinction is arbitrary because it has "the perverse effect of penalizing those transmission owners who engaged in the very proactive planning that Congress and the Commission have established as a high priority for national energy policy, while at the same time rewarding those who may have been less diligent in their planning efforts." ATC Br. 25-26.[13] As FERC noted, however, ATC will benefit significantly from the cost sharing policy in the future, FERC Reh'g Ord. ¶ 98, and, as we next explain, it is not unfair to require ATC to shoulder the costs of projects which were "planned" before any cost sharing policy was in effect.

### C. Other Challenges to FERC's Order

We next consider various other arguments offered by the petitioners. None of them warrants overturning FERC's decision.

First, the petitioners challenge FERC's determination that it was not unfair to deny cost sharing for the excluded projects because they were planned without any assurance that costs would be shared by other transmission providers. In particular, the petitioners object to FERC's statement that the "cost responsibility" for ATC's planned projects "has already been determined." FERC Reh'g Ord. ¶ 97. They contend that, to the

---

[13]The petitioners assert "Wisconsin has proactively ensured that needed baseline reliability upgrades are 'planned' and actually constructed, as [ATC] does on a ten-year planning horizon." PSCW Br. 35. We note, however, that ATC did not begin operating until January 1, 2001 and it is therefore likely that at least some of the planned projects were contemplated before ATC or its ten-year time frame existed.

contrary," [a]ll parties have been long aware that it is this very proceeding that is to 'determine[]' that 'cost responsibility.' " PSCW Br. 28. PSCW misconstrues FERC's language. What FERC meant was that ATC (and other owners) necessarily undertook financial responsibility for projects they planned before it was known whether any cost sharing policy would be adopted[14]—much less a policy that would spread the costs of projects ATC had planned on its own.[15] Thus, although "[g]rid-wide cost recovery is not unexpected" in an ISO, *id*., FERC reasonably determined that the "parties had no way of foreseeing how the RECB Task Force negotiations would come out on the cost allocation mechanism" and therefore "moved forward with [upgrade] projects without any *assurance* that such projects would be candidates for regional cost sharing." FERC Reh'g Ord. ¶ 96 (emphasis added). The transmission providers

---

[14]Although MISO was first proposed in 1998, *see Midwest Indep. Transmission Sys. Operator, Inc.,* 84 F.E.R.C. ¶ 61,231 (1998), it was not granted RTO status until December 2001 and the cost sharing issue first came to the fore when the RECB Task Force was created in March 2004 to "develop[] criteria" for cost sharing. Until such criteria were adopted, MISO was to continue to use Order 2003's " 'default' pricing proposal" as an "interim measure." *Midwest Indep. Transmission Sys. Operator, Inc.*, 108 F.E.R.C. ¶ 61,027, at 61,147 (2004).

[15]Attachment FF's "Baseline Reliability Project" provision calls for extensive cooperation in the planning of upgrades, providing, *inter alia*, that each MISO transmission provider "shall collaborate with Transmission Owning members and with other Transmission Providers to develop appropriate planning models that reflect expected system conditions for the planning horizon," "shall produce an efficient expansion plan that includes all Baseline Reliability Projects determined by the Transmission Provider to be necessary through the planning horizon" and "shall obtain the [Transmission Provider Board's] approval" of its expansion plan. Attachment FF ¶ II(A)(1).

therefore were not unduly prejudiced when MISO adopted a policy that did not provide for sharing the projects' costs.

The petitioners also assert that FERC "mischaracterize[d] the excluded upgrades as 'local,' " PSCW Br. 36, when it stated that "critics of the Midwest ISO's proposal for leaving previously planned projects untouched by the proposed cost sharing, are primarily concerned with their local previously planned project not experiencing the benefits of the proposed cost sharing," FERC Reh'g Ord. ¶ 96. The petitioners argue that FERC's use of "local" reflects an intent to exclude projects from cost sharing notwithstanding such projects improve regional reliability, the criterion for cost sharing under Attachment FF. FERC never disputed that a "planned" project, although locally situated, might improve regional reliability or qualify (but for its advanced planning stage) for cost sharing under Attachment FF. Under MISO's cost allocation policy, the regional effect of a project is simply ignored if the project is excluded because of its planning stage.[16]

The petitioners next contend FERC deviated from its July 8, 2004 compliance order which "required MISO to develop and file a cost recovery policy based on 'payment for transmission upgrades by the parties that cause and benefit from them.' " PSCW Br. 47 (quoting FERC Tariff Ord. at 61,348, 61,351).[17] But the language of FERC's order was hortatory rather than

---

[16]The petitioners similarly argue that FERC's orders fail to recognize that ATC's planned Wisconsin projects are upgrades of the MISO RTO—not pre-RTO "existing" transmission facilities—and therefore should be eligible for cost sharing. Again, under MISO's cost allocation policy whether a project is an "upgrade" of the RTO is irrelevant if it was a "planned" project as of October 7, 2005.

[17]The petitioners' claim that FERC impermissibly deviated from ISO and RTO orders in other cases, PSCW Br. 45-49, is barred under 16 U.S.C. § 825*l*(b), *see supra* note 12.

mandatory, "encourag[ing]" not "requir[ing]" MISO to adopt its own cost allocation policy. *See Midwest Indep. Transmission System Operator, Inc.*, 108 F.E.R.C. ¶ 61,027, at 61,147; *see id.* (noting that, while Order No. 2003, *supra* note 5, "allows independent Transmission Providers to propose innovative cost-recovery methods, it does not require them to make such proposals"). In any event, MISO did adopt such a policy. That its provisions are not what the petitioners would have chosen does not undermine FERC's approval of it. Nor was it necessary that the cost sharing policy "allocate costs with exacting precision." *ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1369 (D.C. Cir. 2004) (citing *Sithe/Independence Power Partners, L.P. v. FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002)). Our precedent requires only that "all approved rates reflect *to some degree* the costs actually caused by the customer who must pay them.' " *Midwest ISO Transmission Owners v. FERC*, 373 F.3d at 1368 (quoting *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir.1992)) (emphasis added); *accord Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1320 (D.C. Cir. 2004); *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 708 (D.C. Cir. 2000). And FERC reasonably concluded that MISO's cost allocation policy meets this standard. Moreover, it is consistent with the "Cost Causation Rate Principles" FERC has embraced in previous decisions, notwithstanding the petitioners' claim to the contrary, *see* PSCW Br. pt. IV; *ISO New England, Inc v. New England Power Pool,* 91 F.E.R.C. ¶ 61,311, at 62,076 (2000) ("Our general principle is to assign costs of various upgrades to those who benefit to the extent that they can be identified").

Finally, the petitioners contend FERC erred in not adopting as the cost-sharing criterion whether a project's estimated in-service date is after October 7, 2005, the date of MISO's tariff filing. In its order, FERC explained not only why it chose the "advanced planning" criterion but also why it rejected the in-service date alternative: "Using either January 1, 2007 or

October 7, 2005 to begin cost sharing for 'in-service' projects would . . . requir[e] cost-sharing for several advanced stage projects, including one large-scale project that has already received state regulatory approvals for construction." FERC Tariff Ord. at 61,364. This explanation was not arbitrary. The in-service date alternative might well be more precise, as PSCW contends, but we cannot reject FERC's reasonable "planned" criterion because it may not "allocate costs with exacting precision," *Midwest ISO Transmission Owners*, 373 F.3d at 1369.[18]

For the foregoing reasons, we conclude that the petitioners have not shown that either FERC's Tariff Order, *Midwest Indep. Transmission Sys. Operator, Inc.,* 114 F.E.R.C. ¶ 61,106 (Feb. 3, 2006), or its Rehearing Order, *Midwest Indep. Transmission Sys. Operator, Inc.,* 117 F.E.R.C. ¶ 61,241 (Nov. 29, 2006), was arbitrary or capricious or without record support. Accordingly, we deny the petitions for review.

*So ordered.*

---

[18]The petitioners also insist that "Wisconsin has kept pace with transmission upgrade construction" notwithstanding the comments "[c]ertain exclusion list supporters" made to the Commission suggesting "the exclusion list was necessary because Wisconsin had lagged behind in transmission construction, and the [ATC] upgrades at issue should be excluded so that Wisconsin could 'catch up' on such construction so that MISO states would begin regional cost sharing on an 'even basis.' " PSCW Br. 39 (quoting Cost Allocation Policy Letter 12). The petitioners acknowledge, however, that FERC itself made no such suggestion. *See* PSCW Br. 41 ("FERC's approval of the exclusion list cites no FERC statement, much less makes a finding, that Wisconsin lagged behind other states in transmission upgrade construction, or that any such lag would be a basis for the exclusion list."). There is, therefore, nothing in FERC's orders to challenge in this respect.