(Slip Opinion) OCTOBER TERM, 2009 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NRG POWER MARKETING, LLC, ET AL. *v.* MAINE PUBLIC UTILITIES COMMISSION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 08–674. Argued November 3, 2009—Decided January 13, 2010

The *Mobile-Sierra* doctrine—see *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.*, 350 U. S. 332, and *FPC* v. *Sierra Pacific Power Co.*, 350 U. S. 348—requires the Federal Energy Regulatory Commission (FERC) to presume that an electricity rate set by a freely negotiated wholesale-energy contract meets the Federal Power Act's (FPA) "just and reasonable" prescription, 16 U. S. C. §7824d(a); the presumption may be overcome only if FERC concludes that the contract seriously harms the public interest. *Morgan Stanley Capital Group Inc.* v. *Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U. S. ___, ___.

For many years, New England's supply of electricity capacity was barely sufficient to meet the region's demand. FERC and New England's generators, electricity providers, and power customers made several attempts to address the problem. This case arises from the latest effort to design a solution. Concerned parties reached a comprehensive settlement agreement (Agreement) that, *inter alia,* established rate-setting mechanisms for sales of energy capacity and provided that the *Mobile-Sierra* public interest standard would govern rate challenges. FERC approved the Agreement, finding that it presents a just and reasonable outcome that is consistent with the public interest. Objectors to the settlement sought review in the D. C. Circuit, which largely rejected their efforts to overturn FERC's approval order, but agreed with them that when a challenge to a contract rate is brought by noncontracting third parties, *Mobile-Sierra*'s public interest standard does not apply.

*Held:* The *Mobile-Sierra* presumption does not depend on the identity of the complainant who seeks FERC investigation. The presumption is not limited to challenges to contract rates brought by contracting par-

ties. It applies, as well, to challenges initiated by noncontracting parties. Pp. 5–11.

(a) *Morgan Stanley* did not reach the question presented here, but its reasoning strongly suggests that the D. C. Circuit's holding misperceives the aim, and diminishes the force, of the *Mobile-Sierra* doctrine. Announced three months after the Court of Appeals' disposition in this case, *Morgan Stanley* reaffirmed *Mobile-Sierra*'s instruction to FERC to "presume that the rate set out in a freely negotiated . . . contract meets the 'just and reasonable' requirement" unless "FERC concludes that the contract seriously harms the public interest." 554 U. S., at ___. The *Morgan Stanley* opinion makes it unmistakably clear that the public interest standard is not, as the D. C. Circuit suggested, independent of, and sometimes at odds with, the "just and reasonable" standard. Rather, the public interest standard defines "what it means for a rate to satisfy the just-and-reasonable standard in the contract context." *Id.*, at ___. And if FERC itself must presume just and reasonable a contract rate resulting from fair, arms-length negotiations, noncontracting parties may not escape that presumption. Moreover, the *Mobile-Sierra* doctrine does not neglect third-party interests; it directs FERC to reject a contract rate that "seriously harms the consuming public." 554 U. S., at ___. Finally, the D. C. Circuit's confinement of *Mobile-Sierra* to rate challenges by contracting parties diminishes the doctrine's animating purpose: promotion of "the stability of supply arrangements which all agree is essential to the health of the [energy] industry." *Mobile*, 350 U. S., at 344. A presumption applicable to contracting parties only, and inoperative as to everyone else—consumers, advocacy groups, state utility commissions, elected officials acting *parens patriae*—could scarcely provide the stability *Mobile-Sierra* aimed to secure. Pp. 5–10.

(b) Whether the rates at issue qualify as "contract rates" for *Mobile-Sierra* purposes, and, if not, whether FERC had discretion to treat them analogously are questions raised before, but not ruled upon by, the D. C. Circuit. They remain open for that court's consideration on remand. Pp. 10–11.

520 F. 3d 464, reversed in part and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, ALITO, and SOTOMAYOR, JJ., joined. STEVENS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–674

NRG POWER MARKETING, LLC, ET AL., PETITIONERS
*v.* MAINE PUBLIC UTILITIES COMMISSION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[January 13, 2010]

JUSTICE GINSBURG delivered the opinion of the Court.

The Federal Power Act (FPA or Act), 41 Stat. 1063, as amended, 16 U. S. C. §791a *et seq.*, authorizes the Federal Energy Regulatory Commission (FERC or Commission) to superintend the sale of electricity in interstate commerce and provides that all wholesale-electricity rates must be "just and reasonable," §824d(a).  Under this Court's *Mobile-Sierra* doctrine, FERC must presume that a rate set by "a freely negotiated wholesale-energy contract" meets the statutory "just and reasonable" requirement.  *Morgan Stanley Capital Group Inc.* v. *Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U. S. ___, ___ (2008) (slip op., at 1).  "The presumption may be overcome only if FERC concludes that the contract seriously harms the public interest." *Ibid.*

This case stems from New England's difficulties in maintaining the reliability of its energy grid.  In 2006, after several attempts by the Commission and concerned parties to address the problems, FERC approved a comprehensive settlement agreement (hereinafter Settlement Agreement or Agreement).  Most relevant here, the

Agreement established rate-setting mechanisms for sales of energy capacity, and provided that the *Mobile-Sierra* public interest standard would govern rate challenges. Parties who opposed the settlement petitioned for review in the United States Court of Appeals for the D. C. Circuit. Among multiple objections to FERC's order approving the Agreement, the settlement opponents urged that the rate challenges of nonsettling parties should not be controlled by the restrictive *Mobile-Sierra* public interest standard. The Court of Appeals agreed, holding that "when a rate challenge is brought by a non-contracting third party, the *Mobile-Sierra* doctrine simply does not apply." *Maine Pub. Util. Comm'n* v. *FERC*, 520 F. 3d 464, 478 (2008) *(per curiam)*.

We reverse the D. C. Circuit's judgment to the extent that it rejects the application of *Mobile-Sierra* to noncontracting parties. Our decision in *Morgan Stanley*, announced three months after the D. C. Circuit's disposition, made clear that the *Mobile-Sierra* public interest standard is not an exception to the statutory just-and-reasonable standard; it is an application of that standard in the context of rates set by contract. The "venerable *Mobile-Sierra* doctrine" rests on "the stabilizing force of contracts." *Morgan Stanley*, 554 U. S., at ___ (slip op., at 19); see *id.,* at 22 (describing contract rates as "a key source of stability"). To retain vitality, the doctrine must control FERC itself, and, we hold, challenges to contract rates brought by noncontracting as well as contracting parties.

## I

In a capacity market, in contrast to a wholesale energy market, an electricity provider purchases from a generator an option to buy a quantity of energy, rather than purchasing the energy itself. To maintain the reliability of the grid, electricity providers generally purchase more capacity, *i.e.*, rights to acquire energy, than necessary to

meet their customers' anticipated demand. For many years in New England, the supply of capacity was barely sufficient to meet the region's demand. FERC and New England's generators, electricity providers, and power customers made several attempts to address this problem. This case stems from the latest effort to design a solution.

In 2003, a group of generators sought to enter into "reliability must-run" agreements with the New England Independent System Operator (ISO), which operates the region's transmission system.[1] In its orders addressing those agreements, FERC directed the ISO to develop a new market mechanism that would set prices separately for various geographical sub-regions. *Devon Power LLC*, 103 FERC ¶61,082, pp. 61,266, 61,271 (2003).

In March 2004, the ISO proposed a market structure responsive to FERC's directions. See *Devon Power LLC*, 107 FERC ¶61,240, p. 62,020 (2004). FERC set the matter for hearing before an Administrative Law Judge (ALJ), who issued a 177-page order largely accepting the ISO's proposal. *Devon Power LLC*, 111 FERC ¶63,063, p. 65,205 (2005). Several parties filed exceptions to the ALJ's order; on September 20, 2005, the full Commission heard arguments on the proposed market structure, and thereafter established settlement procedures. *Devon Power LLC*, 113 FERC ¶61,075, p. 61,271 (2005).

After four months of negotiations, on March 6, 2006, a settlement was reached. Of the 115 negotiating parties, only 8 opposed the settlement.

The Settlement Agreement installed a "forward capacity market" under which annual auctions would set capacity

--------

[1] An ISO is an independent company that has operational control, but not ownership, of the transmission facilities owned by member utilities. ISOs "provide open access to the regional transmission system to all electricity generators at rates established in a single, unbundled, grid-wide tariff . . . ." *Midwest ISO Transmission Owners* v. *FERC*, 373 F. 3d 1361, 1364 (CADC 2004) (internal quotation marks omitted).

prices; auctions would be conducted three years in advance of the time when the capacity would be needed. *Devon Power LLC*, 115 FERC ¶61,340, pp. 62,304, 62,306–62,308 (2006). Each energy provider would be required to purchase enough capacity to meet its share of the "installed capacity requirement," *i.e.*, the minimum level of capacity needed to maintain reliability on the grid, as determined by the ISO. *Id.,* at 62,307. For the three-year gap between the first auction and the time when the capacity procured in that auction would be provided,[2] the Agreement prescribed a series of fixed, transition-period payments to capacity-supplying generators. *Id.,* at 62,308–62,309.

The issue before us centers on §4.C of the Agreement (hereinafter *Mobile-Sierra* provision). Under that provision, challenges to both transition-period payments and auction-clearing prices would be adjudicated under "the 'public interest' standard of review set forth in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U. S. 332 (1956)[,] and [*FPC*] *v. Sierra Pacific Power Co.*, 350 U. S. 348 (1956) (the 'Mobile-Sierra' doctrine)." App. 95. *Mobile-Sierra* applies, §4.C instructs, "whether the [price is challenged] by a Settling Party, a non-Settling Party, or [by] the FERC acting *sua sponte.*" *Ibid.*

FERC approved the Settlement Agreement, "finding that as a package, it presents a just and reasonable outcome for this proceeding consistent with the public interest." 115 FERC, at 62,304. The *Mobile-Sierra* provision, FERC explicitly determined, "appropriately balances the need for rate stability and the interests of the diverse entities who will be subject to the [forward capacity market's auction system]." *Id.,* at 62,335.

Six of the eight objectors to the settlement sought review in the D. C. Circuit. For the most part, the Court of

———————
[2] The transition period runs from December 1, 2006 to June 1, 2010.

Appeals rejected the objectors' efforts to overturn FERC's order approving the settlement. 520 F. 3d, at 467. But the objectors prevailed on the *Mobile-Sierra* issue: The D. C. Circuit held that *Mobile-Sierra* applies only to contracting parties. *Id.,* at 478. In this Court, the parties have switched places. Defenders of the settlement, including the *Mobile-Sierra* provision, are petitioners; objectors to the settlement, victorious in the Court of Appeals only on the *Mobile-Sierra* issue, are respondents.

Because of the importance of the issue, and in light of our recent decision in *Morgan Stanley*, we granted certiorari, 556 U. S. \_\_\_ (2009), to resolve this question: "[Does] *Mobile-Sierra*'s public-interest standard appl[y] when a contract rate is challenged by an entity that was not a party to the contract[?]" Brief for Petitioners i. Satisfied that the answer to that question is yes, we reverse the D. C. Circuit's judgment insofar as it rejected application of *Mobile-Sierra* to noncontracting parties.

## II

The FPA gives FERC authority to regulate the "sale of electric energy at wholesale in interstate commerce." See 16 U. S. C. §824(b)(1). The Act allows regulated utilities to set rates unilaterally by tariff; alternatively, sellers and buyers may agree on rates by contract. See §824d(c), (d). Whether set by tariff or contract, however, all rates must be "just and reasonable." §824d(a). Rates may be examined by the Commission, upon complaint or on its own initiative, when a new or altered tariff or contract is filed or after a rate goes into effect. §§824d(e), 824e(a). Following a hearing, the Commission may set aside any rate found "unjust, unreasonable, unduly discriminatory or preferential," and replace it with a just and reasonable rate. §824e(a).

The *Mobile-Sierra* doctrine originated in twin decisions announced on the same day in 1956: *United Gas Pipe Line*

*Co.* v. *Mobile Gas Service Corp.*, 350 U. S. 332, and *FPC* v. *Sierra Pacific Power Co.*, 350 U. S. 348. Both concerned rates set by contract rather than by tariff. *Mobile* involved the Natural Gas Act, which, like the FPA, requires utilities to file all new rates with the regulatory commission. 15 U. S. C. §717c(c). In *Mobile*, we rejected a gas utility's argument that the file-all-new-rates requirement authorized the utility to abrogate a lawful contract with a purchaser simply by filing a new tariff. 350 U. S., at 336–337. Filing, we explained, was a *precondition* to changing a rate, not an *authorization* to do so in violation of a lawful contract. *Id.,* at 339–344; see *Morgan Stanley*, 554 U. S., at ___ (slip op., at 4).

The *Sierra* case involved a further issue. Not only had the Commission erroneously concluded that a newly filed tariff superseded a contract rate. In addition, the Commission had suggested that, in any event, the contract rate, which the utility sought to escape, was itself unjust and unreasonable. The Commission thought that was so "solely because [the contract rate] yield[ed] less than a fair return on the [utility's] net invested capital." 350 U. S., at 355.

The Commission's suggestion prompted this Court to home in on "the question of how the Commission may evaluate whether a contract rate is just and reasonable." *Morgan Stanley*, 554 U. S., at ___ (slip op., at 4). The *Sierra* Court answered the question this way:

"[T]he Commission's conclusion appears on its face to be based on an erroneous standard. . . . [W]hile it may be that the Commission may not normally *impose* upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bar-

gain. . . . In such circumstances *the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest*—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." 350 U. S., at 354–355 (some emphasis added).

In a later case, we similarly explained: "The regulatory system created by the [FPA] is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity." *Permian Basin Area Rate Cases*, 390 U. S. 747, 822 (1968).[3]

Two Terms ago, in *Morgan Stanley*, 554 U. S. ___, the Court reaffirmed and clarified the *Mobile-Sierra* doctrine. That case presented two questions: First, does the *Mobile-Sierra* presumption (that contract rates freely negotiated between sophisticated parties meet the just and reasonable standard imposed by 16 U. S. C. §824d(a)) "apply only when FERC has had an initial opportunity to review a contract rate without the presumption?" 554 U. S., at ___ (slip op., at 1). "Second, does the presumption [generally] impose as high a bar to challenges by purchasers of wholesale electricity as it does to challenges by sellers?" *Id.,* at

_____

[3] Consistent with the lead role of contracts recognized in *Mobile-Sierra*, we held in *United Gas Pipe Line Co.* v. *Memphis Light, Gas and Water Div.*, 358 U. S. 103, 110–113 (1958), that parties may contract out of the *Mobile-Sierra* presumption. They could do so, we ruled, by specifying in their contracts that a new rate filed with the Commission would supersede the contract rate. Courts of Appeals have approved an option midway between *Mobile-Sierra* and *Memphis Light:* A contract that does not allow the seller to supersede the contract rate by filing a new rate may nonetheless permit the Commission to set aside the contract rate if it results in an unfair rate of return, without a further showing that it adversely affects the public interest. See, *e.g., Papago Tribal Util. Auth.* v. *FERC*, 723 F. 2d 950, 953 (CADC 1983); *Louisiana Power & Light Co.* v. *FERC*, 587 F. 2d 671, 675–676 (CA5 1979).

___ (slip op., at 1–2); see *id.,* at 19–20. Answering no to the first question and yes to the second, the Court emphasized the essential role of contracts as a key factor fostering stability in the electricity market, to the longrun benefit of consumers. *Id.,* at ___, ___ (slip op., at 19, 22); see, *e.g.,* Market-Based Rates ¶6, 72 Fed. Reg. 39906 (2007) (noting chilling effect on investments caused by "uncertainties regarding rate stability and contract sanctity"); *Nevada Power Co.* v. *Duke Energy Trading & Marketing, L. L. C.,* 99 FERC ¶61,047, pp. 61,184, 61,190 (2002) ("Competitive power markets simply cannot attract the capital needed to build adequate generating infrastructure without regulatory certainty, including certainty that the Commission will not modify market-based contracts unless there are *extraordinary* circumstances.").

*Morgan Stanley* did not reach the question presented here: Does *Mobile-Sierra*'s public interest standard apply to challenges to contract rates brought by noncontracting parties? But *Morgan Stanley*'s reasoning strongly suggests that the D. C. Circuit's negative answer misperceives the aim, and diminishes the force, of the *Mobile-Sierra* doctrine.

In unmistakably plain language, *Morgan Stanley* restated *Mobile-Sierra*'s instruction to the Commission: FERC "must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law. The presumption may be overcome only if FERC concludes that the contract seriously harms the public interest." 554 U. S., at ___ (slip op., at 1). As our instruction to FERC in *Morgan Stanley* conveys, the public interest standard is not, as the D. C. Circuit presented it, a standard independent of, and sometimes at odds with, the "just and reasonable" standard, see 520 F. 3d, at 478; rather, the public interest standard defines "what it means for a rate to satisfy the just-and-reasonable standard in the contract context."

*Morgan Stanley*, 554 U. S., at ___ (slip op., at 17). And if FERC itself must presume just and reasonable a contract rate resulting from fair, arms-length negotiations, how can it be maintained that noncontracting parties nevertheless may escape that presumption?[4]

Moreover, the *Mobile-Sierra* doctrine does not overlook third-party interests; it is framed with a view to their protection. The doctrine directs the Commission to reject a contract rate that "seriously harms the consuming public." *Morgan Stanley*, 554 U. S., at ___ (slip op., at 17); see *Verizon Communications Inc.* v. *FCC*, 535 U. S. 467, 479 (2002) (When a buyer and a seller agree upon a rate, "the principal regulatory responsibility [i]s not to relieve a contracting party of an unreasonable rate, . . . but to protect against potential discrimination by favorable contract rates between allied businesses to the detriment of *other* wholesale customers." (Emphasis added.)).

Finally, as earlier indicated, see *supra*, at 7–8, the D. C. Circuit's confinement of *Mobile-Sierra* to rate challenges by contracting parties diminishes the animating purpose of the doctrine: promotion of "the stability of supply arrangements which all agree is essential to the health of the [energy] industry." *Mobile*, 350 U. S., at 344. That dominant concern was expressed by FERC in the order on review: "Stability is particularly important in this case,

––––––––––

[4] The D. C. Circuit emphasized a point no doubt true, but hardly dispositive: Contracts bind parties, not nonparties. *Maine Pub. Util. Comm'n* v. *FERC*, 520 F. 3d 464, 478 (2008) *(per curiam)*. *Mobile-Sierra* holds sway, however, because well-informed wholesale-market participants of approximately equal bargaining power generally can be expected to negotiate just-and-reasonable rates, see *Morgan Stanley Capital Group Inc.* v. *Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U. S. ___, ___ (2008) (slip op., at 17), and because "contract stability ultimately benefits consumers," *id.,* at ___ (slip op., at 22). These reasons for the presumption explain why FERC, surely not legally bound by a contract rate, must apply the presumption and, correspondingly, why third parties are similarly controlled by it.

which was initiated in part because of the unstable nature
of [installed capacity] revenues and the effect that has on
generating units, particularly those . . . critical to main-
taining reliability." 115 FERC, at 62,335. A presumption
applicable to contracting parties only, and inoperative as
to everyone else—consumers, advocacy groups, state
utility commissions, elected officials acting *parens pa-
triae*—could scarcely provide the stability *Mobile-Sierra*
aimed to secure.[5]

We therefore hold that the *Mobile-Sierra* presumption
does not depend on the identity of the complainant who
seeks FERC investigation. The presumption is not limited
to challenges to contract rates brought by contracting
parties. It applies, as well, to challenges initiated by third
parties.

## III

The objectors to the settlement appearing before us
maintain that the rates at issue in this case—the auction
rates and the transition payments—are prescriptions of
general applicability rather than "contractually negotiated
rates," hence *Mobile-Sierra* is inapplicable. See Brief for
Respondents 15–17, and n. 1 (internal quotation marks
omitted). FERC agrees that the rates covered by the
settlement "are not themselves contract rates to which the
Commission was *required* to apply *Mobile-Sierra*." Brief
for FERC 15. But, FERC urges, "the Commission had
discretion to do so," *id.,* at 28; furthermore, "[t]he court of
appeals' error in creating a third-party exception to the
*Mobile-Sierra* presumption is a sufficient basis for revers-
ing its judgment," *id.,* at 22. Whether the rates at issue

---

[5] The FPA authorizes "*[a]ny person*, electric utility, State, municipal-
ity, or State commission" to complain. 16 U. S. C. §825e (emphasis
added). FERC regulations similarly permit "*[a]ny* person [to] file a
complaint seeking Commission action." 18 CFR §385.206(a) (2009)
(emphasis added).

qualify as "contract rates," and, if not, whether FERC had discretion to treat them analogously are questions raised before, but not ruled upon by, the Court of Appeals. They remain open for that court's consideration on remand. See Tr. of Oral Arg. 16.

*    *    *

For the reasons stated, the judgment of the Court of Appeals for the D. C. Circuit is reversed to the extent that it rejects the application of *Mobile-Sierra* to noncontracting parties, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–674

_____

NRG POWER MARKETING, LLC, ET AL., PETITIONERS
*v.* MAINE PUBLIC UTILITIES COMMISSION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[January 13, 2010]

JUSTICE STEVENS, dissenting.

The opinion that the Court announces today is the third chapter in a story about how a reasonable principle, extended beyond its foundation, becomes bad law.

In the first chapter the Court wisely and correctly held that a seller who is a party to a long-term contract to provide energy to a wholesaler could not unilaterally repudiate its contract obligations in response to changes in market conditions by simply filing a new rate schedule with the regulatory commission. Only if the rate was so low that the seller might be unable to stay in business, thereby impairing the public interest, could the seller be excused from performing its contract. That is what the Court held in *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.*, 350 U. S. 332 (1956), and *FPC* v. *Sierra Pacific Power Co.*, 350 U. S. 348 (1956).

In the second chapter the Court unwisely and incorrectly held that the same rule should apply to a buyer who had been forced by unprecedented market conditions to enter into a long-term contract to buy energy at abnormally high prices. The Court held the Federal Energy Regulatory Commission (FERC) could not set aside such a contract as unjust and unreasonable, even though it saddled consumers with a duty to pay prices that would be considered unjust and unreasonable under normal market

conditions, unless the purchaser could also prove that "the
contract seriously harms the public interest." *Morgan
Stanley Capital Group Inc.* v. *Public Util. Dist. No. 1 of
Snohomish Cty.*, 554 U. S. ___, ___ (2008) (slip op., at 1).

The Court held in *Morgan Stanley* that *Mobile-Sierra*
established a presumption: FERC "must presume that the
rate set out in a freely negotiated wholesale-energy con-
tract meets the 'just and reasonable' requirement imposed
by law." 554 U. S., at ___ (slip op., at 1). And that pre-
sumption, according to the Court, is a simple application
of the just-and-reasonable standard to contract rates, not
a different standard of review. *Id.*, at ___ (slip op., at 6)
(rejecting the "obviously indefensible proposition that a
standard different from the statutory just-and-reasonable
standard applies to contract rates"). But applying the
presumption nonetheless sets a higher bar for a rate chal-
lenge.[1] FERC may abrogate the rate only if the public
interest is *seriously* harmed. *Id.,* at ___ (slip op., at 22)
("[U]nder the *Mobile-Sierra* presumption, setting aside a
contract rate requires a finding of 'unequivocal public
necessity,'" *Permian Basin Area Rate Cases*, 390 U. S. 747,
822 (1968), "or 'extraordinary circumstances,' *Arkansas
Louisiana Gas Co.* v. *Hall*, 453 U. S. 571, 582 (1981)").

As I explained in my dissent in *Morgan Stanley*, the
imposition of this additional burden on purchasers chal-
lenging rates was not authorized by the governing statute.
Under the Federal Power Act (FPA), all wholesale electric-
ity rates must be "just and reasonable." 16 U. S. C.
§824d(a). "[N]othing in the statute mandates differing
application of the statutory standard to rates set by con-

––––––––––

[1] Whether the Court explains the *Mobile-Sierra* doctrine as a pre-
sumption or as a different standard of review, "[t]here is no significant
difference between requiring a heightened showing to overcome an
otherwise conclusive presumption and imposing a heightened standard
of review." *Morgan Stanley,* 554 U. S., at ___ (slip op., at 3) (STEVENS,
J., dissenting).

tract." *Morgan Stanley*, 554 U. S., at \_\_\_ (slip op., at 3) (STEVENS, J., dissenting) (internal quotation marks omitted; emphasis deleted). And the *Mobile-Sierra* line of cases did not "mandate a 'serious harm' standard of review," much less "require any assumption that high rates and low rates impose symmetric burdens on the public interest." *Morgan Stanley,* 554 U. S., at \_\_\_ (slip op., at 7) (STEVENS, J., dissenting). Instead, "the statement in *Permian Basin* about 'unequivocal public necessity,' 390 U. S., at 822, speaks to the difficulty of establishing injury to the public interest in the context of a low-rate challenge," *i.e.*, one brought by sellers of electricity. *Id.*, at \_\_\_ (slip op., at 8). It does not establish a new standard that applies as well to a "high-rate challenge" brought by purchasers. *Ibid.*

But even accepting *Morgan Stanley* as the law, the Court unwisely goes further today. In this third chapter of the *Mobile-Sierra* story, the Court applies a rule—one designed initially to protect the enforceability of freely negotiated contracts against parties who seek a release from their obligations—to impose a special burden on third parties exercising their statutory right to object to unjust and unreasonable rates. This application of the rule represents a quantum leap from the modest origin set forth in the first chapter of this tale. As the Court of Appeals correctly concluded in the opinion that the Court sets aside today: "This case is clearly outside the scope of the *Mobile-Sierra* doctrine." *Maine Pub. Util. Comm'n* v. *FERC*, 520 F. 3d 464, 477 (CADC 2008) *(per curiam).*

As the D. C. Circuit noted,[2] "[c]ourts have rarely men-

_____

[2] Because the D. C. Circuit's opinion was written before this Court's decision in *Morgan Stanley*, that court's purported error in describing the *Mobile-Sierra* doctrine as an "exception" to the just-and-reasonable standard, 520 F. 3d, at 477, is understandable. As that court recognized, and the majority does not change today, the *Mobile-Sierra* standard in fact "makes it harder for [respondents] to successfully

tioned the *Mobile-Sierra* doctrine without reiterating that it is premised on the existence of a voluntary contract between the parties." *Ibid.* But, the Court asks, "[I]f FERC itself must presume just and reasonable a contract rate resulting from fair, arms-length negotiations, how can it be maintained that noncontracting parties nevertheless may escape that presumption?" *Ante,* at 9. This Court's understanding of *Sierra* provides an answer. "*Sierra* was grounded in the commonsense notion that '[i]n wholesale markets, the party charging the rate and the party charged [are] often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a "just and reasonable" rate *as between the two of them*.'" *Morgan Stanley*, 554 U. S., at ___ (slip op., at 17) (quoting *Verizon Communications Inc.* v. *FCC,* 535 U. S. 467, 479 (2002); emphasis added). This "commonsense notion" supports the rule requiring FERC to apply a presumption against letting a party out of its own contract, as the D. C. Circuit recognized. 520 F. 3d, at 478 ("The *Mobile-Sierra* doctrine applies a more deferential standard of review to preserve the terms of the bargain as between the contracting parties"). It does not, however, support a rule requiring FERC to apply a presumption against abrogating any rate set by contract, even when, as in this case, a noncontracting party may be required in practice to pay a rate it did not agree to.

   The Court further reasons that "confinement of *Mobile-Sierra* to rate challenges by contracting parties diminishes the animating purpose of the doctrine," which is ensuring the stability of contract-based supply arrangements. *Ante*, at 9. Maybe so, but applying *Mobile-Sierra* to rate challenges by noncontracting parties loses sight of the animating purpose of the FPA, which is "the protection of the public interest." *Sierra*, 350 U. S., at 355. That interest is

_____

challenge rates."  520 F. 3d, at 478.

"the interest of consumers in paying '"the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest."'" *Morgan Stanley*, 554 U. S., at ___ (slip op., at 7) (STEVENS, J., dissenting) (quoting *Permian Basin*, 390 U. S., at 793). I do not doubt that stable energy markets are important to the public interest, but "under the FPA, Congress has charged FERC, not the courts, with balancing the short-term and long-term interests of consumers" under the just-and-reasonable standard of review. *Morgan Stanley,* 554 U. S., at ___ (slip op., at 9) (STEVENS, J., dissenting). The Court today imposes additional limits upon FERC's ability to protect that interest. If a third-party wholesale buyer can show a rate harms the public interest (perhaps because it is too high to be just and reasonable under normal review), but cannot show it *seriously* harms the public, FERC may do nothing about it.[3]

The Court assures respondents that the "public interest standard" does not "overlook third-party interests" and is "framed with a view to their protection." *Ante*, at 8, 9. Perhaps in practice the *Mobile-Sierra* doctrine will protect third parties' interests, and the public interest, just as well as the so-called "ordinary" just-and-reasonable standard. But respondents are rightly skeptical. The *Mobile-Sierra* doctrine, as interpreted by the Court in *Morgan Stanley*, must pose a higher bar to respondents' rate challenge—that is, it requires them to show greater harm to

_____

[3] FERC agrees with petitioners that the public interest standard "govern[s] all challenges to the rates set by contract, regardless of the identity of the challenger." Reply Brief for FERC 4. But "not even FERC has the authority to endorse [this] rule." *Morgan Stanley*, 554 U. S., at ___ (slip op., at 9) (STEVENS, J., dissenting). "The FPA does not indulge, much less require, a 'practically insurmountable' presumption, see *Papago Tribal Util. Auth.* v. *FERC*, 723 F. 2d 950, 954 (CADC 1983) (opinion for the court by Scalia, J.), that all rates set by contract comport with the public interest and are therefore just and reasonable." *Id.*, at ___ (slip op., at 9–10).

the public.[4]   Otherwise, it would hardly serve to protect
contract stability better than the plain vanilla just-and-
reasonable standard and the Court's decision in *Morgan
Stanley* would have little effect.  Furthermore, the Court
today reiterates that the doctrine poses a high bar.  See
*ante*, at 7–8.

   It was sensible to require a contracting party to show
something more than its own desire to get out of what
proved to be a bad bargain before FERC could abrogate
the parties' bargain.  It is not sensible, nor authorized by
the statute, for the Court to change the *de facto* standard
of review whenever a rate is set by private contract, based
solely on the Court's view that contract stability should be

————————

   [4] In my view, "whether a rate is 'just and reasonable' is measured
against the public interest, not the private interests of regulated
[parties]."  *Id.,* at ___ (slip op., at 7).  But I note the Court's assertion
that the *Mobile-Sierra* doctrine protects "third-party interests," *ante,* at
9, is a new twist on the "public interest standard" as traditionally
understood.  As the Court recognized in *Morgan Stanley*, one conse-
quence of applying *Mobile-Sierra* is that "'the sole concern of the
Commission'" is the public interest, and FERC cannot consider, for
example, whether a rate guarantees a sufficient rate of return to a
regulated entity.  554 U. S., at ___ (slip op., at 4) (quoting *FPC* v. *Sierra
Pacific Power Co.*, 350 U. S. 348, 355 (1956)); see also *Morgan Stanley*,
554 U. S., at ___ (slip op., at 17, n. 3).  In addition to requiring that
FERC find some greater degree of harm to the public than would be
required under the ordinary just-and-reasonable standard, therefore,
the *Mobile-Sierra* doctrine leaves little room for respondents—at least
one of which did not negotiate the rate but must nonetheless purchase
electricity at that price in the forward capacity market unless it self-
supplies its capacity—to assert their private interest in making a rate
challenge.  The Court suggests that FERC could set aside a rate under
the public interest standard if the contract established favorable rates
between allied businesses to the detriment of other wholesale custom-
ers, *ante*, at 9, but has not spelled out whether a challenger would still
have to show that circumstance harmed the public interest.  It remains
unclear whether a noncontracting party that must purchase or sell
electricity at a rate it did not negotiate could argue that a rate fails the
"public interest standard" because the rate is detrimental to that
entity's private interest.

preserved unless there is extraordinary harm to the public interest.

For these reasons, I respectfully dissent.