# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 18, 2011        Decided July 1, 2011

No. 10-1075

MARKWEST MICHIGAN PIPELINE COMPANY, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

GULFMARK ENERGY, INC.,
INTERVENOR

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Charles F. Caldwell* argued the cause for petitioner. With him on the briefs was *Elizabeth B. Kohlhausen*.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondents. With her on the brief were *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, *Thomas R. Sheets*, General Counsel, Federal Energy Regulatory Commission, and *Robert H. Solomon*, Solicitor. *John J. Powers III*, Attorney, U.S. Department of Justice, entered an appearance.

Before: GINSBURG and GRIFFITH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*:  To settle a dispute over rates, oil pipeline owner MarkWest agreed with two of its three shippers to restrict rate increases for a three-year period. But neither the agreement nor the relevant regulations clearly lay out how to determine the rates MarkWest may charge now that the three-year period is past. MarkWest proposed its view, which the Federal Energy Regulatory Commission (FERC) rejected and replaced with its own. Finding both the agreement and the regulations ambiguous, we defer to the reasonable views of the Commission and deny MarkWest's petition for review.

I

To reduce costs, delays, and uncertainties associated with determining whether rates are just and reasonable, Congress enacted the Energy Policy Act of 1992 (EPAct), Pub. L. No. 102-486, 106 Stat. 2776.[*] The EPAct required FERC to

---

[*] The federal government has regulated interstate oil pipelines as common carriers under the Interstate Commerce Act (ICA) since 1906. *See* Hepburn Act, Pub. L. No. 59-337, § 1, 34 Stat. 584, 584 (1906). The ICA requires that pipeline owners charge their shippers rates that are "just and reasonable." 49 U.S.C. app. § 15(1) (1988); *see also id.* § 1(5). Regulatory authority resided in the Interstate Commerce Commission (ICC) until 1977, when Congress created FERC. *See* Department of Energy Reorganization Act, Pub. L. No. 95-91, § 402(b), 91 Stat. 565, 584 (1977). Although Congress has since amended the ICA, FERC regulates oil pipelines under the statute as it existed in 1977. *See* Act of Oct. 17, 1978, Pub. L. No. 95-473, § 4(c), 92 Stat. 1337, 1470. This version of the ICA was

establish "a simplified and generally applicable ratemaking methodology for oil pipelines." *Id.* § 1801, 106 Stat. at 3010 (codified at 42 U.S.C. § 7172 note). In 1996, FERC promulgated Order No. 561 to implement this mandate. *See* Order No. 561, *Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, 58 Fed. Reg. 58,753 (Nov. 4, 1993). *See generally Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424 (D.C. Cir. 1996) (upholding Order No. 561).

Order No. 561 uses an "indexing system" to set "ceiling levels" that limit increases in pipeline rates. 58 Fed. Reg. at 58,754. The calculation of that ceiling begins with an "initial rate"—a baseline rate that FERC has determined to be just and reasonable for any one of three reasons: (1) it was grandfathered in by the EPAct, *see* Pub. L. No. 102-486, § 1803, 106 Stat. at 3011 (codified at 42 U.S.C. § 7172 note); (2) the pipeline has filed evidence of the actual costs of operation to support the rate, *see* 18 C.F.R. § 342.2(a); or (3) one shipper has agreed in writing to pay the rate and no other shipper has protested, *see id.* § 342.2(b). The initial rate is the rate the pipeline charges during the first "index year"— the period from July 1 to June 30. Each year thereafter, the pipeline's price hikes are limited by a ceiling level that accounts for inflation. To determine its first inflation adjustment, a pipeline owner multiplies its initial rate by the FERC Oil Pipeline Index, a coefficient FERC publishes annually based on the Department of Labor's Producer Price Index for Finished Goods. The next year, the pipeline owner adjusts its ceiling level "by multiplying the previous index year's ceiling level by the most recent [FERC coefficient]." *Id.* § 342.3(d)(1). That process is repeated for each successive

---

last codified as an appendix to Title 49 of the 1988 U.S. Code. *See* 49 U.S.C. app. §§ 1-27 (1988).

index year. In this case especially, it is important to note that even though a pipeline owner may charge a rate below the ceiling level, *see id.* § 342.3(a), the maximum charge for the next year is computed by multiplying the current year's ceiling level by the Oil Pipeline Index for that year, and not by the actual rate charged, *id.* § 342.3(d)(1).

An example illustrates how FERC uses indexing. Suppose that the Commission found that a pipeline's rate of 100 cents per barrel in 2005 was just and reasonable, permitting the owner to set this price as his pipeline's initial rate. Because the Commission's inflation index for the year starting July 1, 2006, was 1.061485, 71 Fed. Reg. 29,951 (May 24, 2006), during the next year the same pipeline could charge no more than 106.1485 cents per barrel, *i.e.*, 100 multiplied by 1.061485. The inflation index for the year starting July 1, 2007, was 1.043186, 119 FERC ¶ 61,155 (May 16, 2007), so in that year the pipeline could charge no more than 110.7326 cents per barrel: the previous year's ceiling level of 106.1485 cents per barrel multiplied by 1.043186.

Once FERC has approved a pipeline's initial rate, that baseline continues to provide the starting point for calculating the pipeline's ceiling levels each year unless and until the pipeline owner establishes a new initial rate. Pursuant to 18 C.F.R. § 342.3(d)(5), a pipeline owner can set a new initial rate using one of three "method[s] other than indexing": (1) by showing that it has experienced cost increases that exceed the rate increases indexing would allow, *id.* § 342.4(a); (2) by showing that it lacks market power and therefore could not set a new initial rate that would be anticompetitive, *id.* § 342.4(b); or (3) by showing that all of its shippers consent to a new initial rate, *id.* § 342.4(c). When a pipeline owner is allowed to set a new initial rate under one

of these scenarios, that rate becomes the just and reasonable baseline to which the Commission's indexing method applies in subsequent years.

On November 18, 2005, petitioner MarkWest filed rates with the Commission for its Michigan pipeline. Two of the three shippers that use the pipeline—Sunoco and GulfMark Energy—protested. Merit Energy, which does not itself use the pipeline but sells oil to companies that do, also protested. On January 31, 2006, before the Commission considered the dispute, the parties agreed to a settlement, which the Commission subsequently approved.

Although the settlement agreement had no term, it created a three-year "Moratorium Period" from January 31, 2006, until January 31, 2009, during which the agreement set the maximum rates MarkWest could charge its shippers. Settlement Agreement 4. Like the Commission's indexing method, the settlement agreement set an initial rate for shipping for the first five months of the Moratorium Period, January 31 through June 30, 2006. For the index years that began on July 1, 2006, 2007, and 2008, the settlement agreement established an "Annual Inflation Cap" that, like FERC indexing, pegged MarkWest's maximum rates to the Department of Labor's Producer Price Index statistics. Unlike FERC's Oil Pipeline Index, however, the Annual Inflation Cap used a slightly different measure of inflation that in most years yields a lower rate.

But the settlement agreement did not ignore the FERC ceiling levels. During the Moratorium Period, the settlement agreement allowed MarkWest to "increase . . . rates" each July 1 "to reflect . . . inflation adjustments as promulgated annually by the FERC," provided that this figure "[did] not exceed [the Annual Inflation Cap]." Settlement Agreement 4.

Thus the settlement agreement restricted MarkWest's right to increase pipeline prices to the lesser of either the pipeline's ceiling levels under FERC's indexing system or the increase permitted by the Annual Inflation Cap. As it turned out, for each year of the Moratorium Period, the Annual Inflation Cap provided for rates that were less than the pipeline's ceiling levels.

All agree that the Commission's indexing methodology will govern MarkWest's rates now that the Moratorium Period is past. The only dispute in this case concerns the initial rate MarkWest must use to calculate its new annual ceiling levels. MarkWest argues that after the end of the Moratorium Period, its ceiling levels should be calculated as if its maximum rates had been set under FERC's indexing methodology all along. In other words, MarkWest would have FERC go back to the initial rate for 2006 and, using that as the baseline, apply its inflation measure for each year thereafter. In contrast, the Commission would simply pick up the rates where the settlement agreement left off, using the last rate under the agreement as the initial rate for the period after the agreement. *See MarkWest Mich. Pipeline Co.*, Order on Tariff Filing and Granting Clarification, 126 FERC ¶ 61,300 (Mar. 31, 2009) [hereinafter Order]; *MarkWest Mich. Pipeline Co.*, Order Denying Rehearing, 130 FERC ¶ 61,084 (Feb. 2, 2010) [hereinafter Rehearing Order].

The Commission's approach creates two consequences MarkWest seeks to avoid. First, it will require MarkWest to charge substantially lower rates going forward because it uses a lower initial rate. Second, under the Commission's approach, even though the agreement's Moratorium Period ended on January 31, 2009, MarkWest could not raise its rates until the next index year began on July 1, 2009. The Commission read the settlement agreement as setting new

initial rates on July 1, 2008, Order 4, and FERC regulations do not permit a pipeline owner to use indexing to raise its rates above the initial rate until the start of the next index year, 18 C.F.R. § 342.3(d)(5).

On March 31, 2009, the Commission rejected MarkWest's rate filing on the ground that its proposed rates were too high because the settlement agreement established new initial rates on July 1, 2008. 126 FERC ¶ 61,300. On February 2, 2010, the Commission denied MarkWest's petition for rehearing. 130 FERC ¶ 61,084. MarkWest filed a timely petition for review in this Court on April 2, 2010. We have jurisdiction pursuant to 28 U.S.C. § 2342 (1976).

II

In *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569-70 (D.C. Cir. 1987), we read the Supreme Court's decision in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to require deference to the Commission's interpretation of language in a settlement agreement resolving rate disputes. The court identified two reasons for such deference. First, Congress explicitly delegated to FERC broad powers over ratemaking, including the power to analyze relevant contracts. *Nat'l Fuel Gas Supply Corp.*, 811 F.2d at 1569-70. In this case, the Commission had an important role in the settlement agreement: by its terms the agreement only became binding when approved by the Commission. Settlement Agreement 7. Second, in rate-setting cases like this one, the Commission has "familiarity with the field of enterprise to which the contract pertains." *Nat'l Fuel Gas Supply Corp.*, 811 F.2d at 1570.

Applying *Chevron*, "we first consider *de novo* whether the settlement agreement unambiguously addresses the matter at issue. If so, the language of the agreement controls . . . ." *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 498 (D.C. Cir. 2003) (internal citations omitted). If the agreement is ambiguous or silent, however, "we defer to the Commission's construction of the provision at issue so long as that construction is reasonable." *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814-15 (D.C. Cir. 1998).

Step one of this analysis is not difficult because the settlement agreement is silent on the matter of how to set the ceiling on rates following the Moratorium Period. Under these circumstances, we must defer to the Commission's interpretation if reasonable.

MarkWest argues that the settlement agreement did not change its initial rates, observing that during the Moratorium Period the agreement required the parties to calculate the maximum rate MarkWest could have charged under the Commission's indexing method. Though this rate could only be charged if it were lower than the rate derived under the Annual Inflation Cap, MarkWest contends that the agreement's use of FERC indexing somehow shows that the parties did not intend to change the pipeline's initial rates.

The Commission addressed this argument in its Rehearing Order, explaining that "[t]he fact that MarkWest's Settlement . . . uses the Commission's indexing regulations as a procedural framework to implement the Settlement does not change the character of the rates MarkWest filed pursuant to the terms of the Settlement." Rehearing Order 7. That is, the settlement agreement's use of FERC indexing during the Moratorium Period reveals little, if anything, about what

baseline the parties expected FERC indexing to use after the Moratorium Period ended.

MarkWest also challenges the Commission's view that the settlement agreement established new initial rates for the index year that began on July 1, 2008, which could not be adjusted for inflation until July 1, 2009, the start of the next index year. *See* 18 C.F.R. § 342.3(d)(5) (providing that when a pipeline owner establishes a new initial rate, that rate will be the applicable ceiling level until the start of the next index year). MarkWest argues that the Commission's interpretation reads out of the agreement the January 31, 2009, end date of the Moratorium Period by effectively extending this period to July 1. Pointing to the "cardinal principle of contract construction . . . that a document should be read to give effect to all its provisions," *Segar v. Mukasey*, 508 F.3d 16, 22 (D.C. Cir. 2007) (internal quotation marks omitted), MarkWest argues that the Commission treats the three-year Moratorium Period as if it were actually three years and five months long.

But this mischaracterizes what the Commission has done. As explained in its Rehearing Order, the Commission simply reads the agreement as setting new initial rates on July 1, 2008. Rehearing Order 8. Under the Commission's regulations, a pipeline owner cannot adjust an initial rate for inflation until the beginning of the next index year, which in this instance began on July 1, 2009. *See* 18 C.F.R. § 342.3(d)(5). But the Commission did nothing to extend the Moratorium Period, and MarkWest was free to change its rates in other ways once the period ended. For example, during the Moratorium Period MarkWest could not set new initial rates in excess of the rates it was permitted to charge under the Annual Inflation Cap. Once the Moratorium Period ended, however, it was free to depart from the Annual Inflation Cap's limits on new initial rates so long as it did so

in a way that the Commission's regulations allow. Despite MarkWest's arguments to the contrary, we conclude that the agreement is ambiguous as to whether it established new initial rates.

In the face of this ambiguity, the Commission's reading of the settlement agreement was reasonable. As the Commission recognized, Order 4, the parties specified a method for calculating maximum annual rate increases during the Moratorium Period that closely tracks the FERC indexing methodology by using the maximum rates from one year as the basis for calculating the next year's ceiling levels. Like FERC indexing, the settlement agreement's Annual Inflation Cap specifies a formula for deriving a coefficient based on the Department of Labor's Producer Price Index inflation statistics. The settlement agreement also directs MarkWest to calculate its maximum annual rate increases by multiplying this coefficient by the previous year's maximum rates. Though the Annual Inflation Cap and FERC indexing incorporate different measures of inflation, they use the same basic approach.

These similarities suggest that the parties may have intended a further similarity as well. FERC indexing uses the maximum rate a pipeline owner is allowed to charge in one year to calculate the maximum rate that it may charge the next year. In the same way, the parties may have intended to use the maximum rate MarkWest was allowed to charge at the end of the Moratorium Period to calculate rates after the Moratorium Period ended. The parties agreed that the Annual Inflation Cap would provide fair, inflation-adjusted maximum rates during the Moratorium Period, and it would hardly be surprising if they also thought the Annual Inflation Cap would provide a fair initial rate for calculating future rate increases. The settlement agreement does not clearly adopt this

approach, but neither does it rule out this possibility. Confronted with such silence, we defer to the Commission's reasonable view of the matter.

III

MarkWest argues in the alternative that the Commission's regulations clearly require it to find that the settlement agreement did not change the pipeline's initial rates. But the regulations are no less ambiguous on this point than the settlement agreement itself, and, once again, we must defer to the Commission's reasonable views. An agency's interpretation of its own ambiguous regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted); *see also Marseilles Land & Water Co. v. FERC*, 345 F.3d 916, 920 (D.C. Cir. 2003) ("[A]gencies are entitled to great deference in the interpretation of their own rules.").

This case required the Commission to decide which of two provisions of 18 C.F.R. § 342 should apply to the parties' settlement agreement. As we have already noted, § 342.3(a) allows a carrier to set rates below a given year's ceiling levels without having to reduce its ceilings in subsequent years. MarkWest contends that the settlement agreement did nothing more than what this section provides. The parties merely agreed that rates could be set below the ceiling levels on a temporary basis during the Moratorium Period. Taking advantage of that provision, MarkWest argues, had no effect on the initial rate.

However, under § 342.3(d)(5) a pipeline in effect establishes new initial rates when it sets rates "by a method other than indexing." The Commission's regulations treat

"[s]ettlement rates" as one such method. Section 342.4(c) expressly provides:

> *Settlement rates.* A carrier may change a rate without regard to the ceiling level under § 342.3 if the proposed change has been agreed to, in writing, by each person who, on the day of the filing of the proposed rate change, is using the service covered by the rate.

The Commission found that this case fits § 342.3(d)(5).

MarkWest argues that § 342.3(a), not § 342.3(d)(5), applies to the settlement agreement because the agreement's rate regime does not precisely fit § 342.4(c). Section 342.4(c) requires that shippers unanimously consent to a settlement rate, but only two of MarkWest's three shippers were parties to the settlement agreement. Moreover, § 342.4(c) envisions settlements that raise rather than lower a pipeline's ceiling levels. *See Frontier Pipeline Co. v. FERC*, 452 F.3d 774, 777 (D.C. Cir. 2006) ("A pipeline may raise a rate *above* the resulting ceiling level . . . only if . . . all customers consent."); Order No. 561, 58 Fed. Reg. at 58,764 (explaining that the Commission adopted § 342.4(c) to permit carriers to charge rates to which shippers consent "even though these rates may be above the ceiling level that would apply under the indexing methodology").

But neither does the settlement agreement clearly qualify as a § 342.3(a) rate reduction. That provision contemplates a carrier changing its rates in response to competitive pressures, not in order to settle a legal dispute over whether its ceiling levels are just and reasonable. Order No. 561, 58 Fed. Reg. at 58,759 (explaining how § 342.3's indexing methodology allows carriers "to change rates rapidly to respond to

competitive forces"); Order 6 (observing that the regulations allow pipeline owners to "raise their rates at any time to the ceiling rate if the competitive situation later permits such a rate increase because any increase up to that level is presumed to be just and reasonable").

Confronted with a scenario that its regulations did not anticipate, the Commission acted reasonably in treating the settlement agreement as it would treat a § 342.4(c) settlement. "Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives," *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151 (1991), we defer to the Commission's reasonable interpretation of its own regulations.

IV

For the foregoing reasons, the petition for review is

*Denied.*